Rebecca G. SPRINGER, as Executrix of the Estate of Jon Ricky Springer, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 83–1198–15.

United States District Court, D. South Carolina, Rock Hill Division.

Feb. 21, 1986.

As Corrected July 15, 1986.

914

R. Frank Plaxco and Bradford N. Martin, Leatherwood, Walker, Todd and Mann, Greenville, S.C., Thomas H. Pope and Thomas H. Pope, III, Newberry, S.C., for plaintiff.

Thomas B. Almy, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER

HAMILTON, District Judge.

This action arises out of the crash of a Cessna 210 airplane shortly after take-off from Bryant Field, Rock Hill, South Carolina on December 1, 1981. The pilot, Jon Ricky Springer, and a passenger, Paul R. Hargett, were both killed.

The executrix of the Springer estate, Rebecca G. Springer, commenced this action in May 1983. The action includes claims under the South Carolina Survival Act, S.C. Code Ann. § 15–5–90 *et seq.* (1976), and the South Carolina Wrongful Death Act, S.C. Code Ann. § 15–51–10 *et seq.* (1976). Suit

is permitted by the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*[1]

The complaint alleged that defendant's negligence proximately caused the airplane crash and Springer's resulting death. Specifically, plaintiff alleged that the defendant's failure to warn Springer of a severe low-level wind shear condition, about which it knew or should have known, caused the crash of the Cessna. The answer denied defendant's negligence and pled, as affirmative defenses, the negligent acts of others and/or Springer as the sole proximate cause of the accident. The defendant also alleged contributory negligence by Springer.[2] The thrust of the defense was that Springer's death resulted from spatial disorientation, and/or Springer's negligence in operating the aircraft.

Trial of this case commenced on the morning of November 4, 1985 at the United States Courthouse, Rock Hill, South Carolina and continued for eight days, ending on November 13, 1985. After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Fed.R.Civ.Proc. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## I. HISTORY OF FLIGHT

1. On December 1, 1981, between 6 and 6:15 p.m., Jon Ricky Springer ("Springer") and Paul R. Hargett ("Hargett") departed the Rock Hill (Bryant Field) airport in a Cessna 210 aircraft, Registration N5339Y. Springer was pilot-in-command. Their destination was North Myrtle Beach airport. The departure was on runway 19, to the south. About 60 to 70 seconds after liftoff, the plane crashed and burned.[3] Both Springer and Hargett died as a result of the crash. The only cargo on board was two flight bags, a small suitcase and a suit in a garment bag.[4] The fuel tanks were full.

2. Runway 19 at Bryant Field is 5,000 feet long, with an elevation of 669 feet above mean sea level (MSL).[5] The crash site is just over one-half mile southwest of the southern end of the runway.[6] The elevation of the crash site is approximately 680 feet above MSL, or 11 feet higher than that of the runway.[7] The crash site is a heavily wooded area, with tall pines about 40–50 feet in height.[8]

3. From the physical evidence at the crash site and the wreckage, the following was established:

1. An administrative claim had been filed by the plaintiff as required under 28 U.S.C. § 2675. The claim was denied by the defendant before this suit was instituted.

2. Defendant's answer originally pled the comparative negligence of Springer. At a pretrial conference held on October 31, 1985, the court granted defendant's oral motion to amend its answer, substituting the affirmative defense of contributory negligence for the defense of comparative negligence previously entered.

3. Mitchell estimated that the crash occurred at about a minute after the airplane disappeared in the clouds. Mitchell Deposition at 51. Rhodes estimated that the impact occurred 45 seconds to one minute after the plane entered the clouds. Rhodes Testimony at 1–53.

4. Stipulation # 29.

5. Stipulation # 15. The actual stipulation uses the misnomer "altitude" to refer to Bryant Field's height above MSL. To avoid ambiguity, this order uses "elevation" to refer to ground height above mean sea level (MSL); "height" refers to the height of an object, aircraft or point above ground level (AGL); and "altitude" refers to the height of an object, aircraft or point above mean sea level. All are expressed in feet. Also to avoid ambiguity, "miles" refers to international nautical miles, and "statute miles" refers to statute miles. A statute mile is 5,280 feet. A nautical mile is 6,076.115 feet or 1.15 statute miles.

6. *See* Defendant's Exhibit 54, an aerial photograph of the area.

7. Stipulation # 15.

8. *See* Plaintiff's Exhibit 2, and Defendant's Exhibits 58–61 (photographs of crash site).

(a) The aircraft's vertical path through the trees was at 30° to 40° below the horizontal;

(b) The aircraft's left wing was down about 60° as it traveled through the trees;

(c) The heading through the trees to the impact crater was about 340° magnetic;

(d) The propeller was turning and the engine was developing power through the trees and at impact. The tachometer was frozen on impact at 2,500 rpms; and

(e) The aircraft was demolished.

4. Springer was the holder of a current commercial pilot's certificate for the operation of single and multi-engine fixed wing aircraft with an instrument rating. He had logged more than 2,000 hours as pilot-in-command, including 118.9 hours in actual instrument flight conditions.[9] There is no evidence of any physical impairment or condition adversely affecting Springer's abilities on the date of the accident.[10] His most recent FAA proficiency/qualification check had taken place on September 16, 1981.[11] The court finds from the above facts and the relevant testimony, that Springer was competent by training, experience and physical condition to act as pilot-in-command on the intended flight of December 1, 1981,[12] particularly under the prevailing instrument flight conditions.

5. Springer was the president and principal shareholder of Caro-Wings Flight Service, Inc., the fixed base operator of the Rock Hill Airport. Donald K. Rhodes was the general manager and chief pilot of Caro-Wings.

6. The Rock Hill airport is a satellite airport of Douglas Municipal Airport at Charlotte, North Carolina. The center of the Rock Hill airport is 17.2 statute miles from the Charlotte airport. On December 1, 1981, for at least 9 hours prior to the accident, runway 36L of the Charlotte Airport was in use for landing aircraft.[13] The Fort Mill VOR, located 5.3 nautical miles east of Rock Hill Airport and 12.6 miles south of the southern end of Charlotte runway 36L, was the initial approach fix (IAF) for Instrument Landing System (ILS) approaches to Charlotte runway 36L. The outer marker, also known as GLASI, located 6.3 miles from the threshold of runway 36L, was the final approach fix (FAF). On crossing GLASI, approaching aircraft were instructed to be at a height of 2100 feet above threshold ground level.[14]

7. The Rock Hill airport was within air space controlled by the Charlotte TRACON.[15] Aircraft departing Rock Hill on IFR flight flight plans were required to depart under clearances issued by an appropriate Federal Aviation Administration (FAA) facility, and to fly through the Charlotte control area as directed by the Charlotte TRACON.

8. On December 1, 1981, at 2:49 p.m., an IFR flight plan was filed with the Greer (South Carolina) Flight Service Station (FSS) for Springer's planned flight to

---

9. Stipulation # 6. "Actual instrument" hours is limited to aviation in actual instrument weather conditions and is narrower than hours spent flying on IFR flight plans.

10. Barnhouse Testimony at 7–194, 195; and Taylor Testimony at 8–61.

11. *See* Plaintiff's Exhibit 7.

12. *See also,* Rhodes Testimony at 1–33.

13. *See* Plaintiff's Exhibit 39, "The Yeager Transcript" (transcripts of select conversations between pilots and Charlotte air traffic controllers on December 1, 1981).

14. Stipulation # 12.

15. TRACON is the traffic control, or radar room, manned by air traffic controllers monitoring airborne aircraft in the control area, and assigning headings and altitudes to arriving and departing aircraft. Three positions were manned on December 1, 1981: (1) final approach, which was assigned a rectangular airspace about 6 miles in width (3 miles on either side of runway 36L) and 20 miles in length, extending south from the runway; (2) arrival/departure west which was assigned the remaining airspace west of the runway; and (3) arrival/departure east, which was assigned the remaining airspace east of the runway. Rock Hill airport was in the west arrival/departure sector, and was located about 2½ miles west of the final approach sector.

North Myrtle Beach. The flight was to depart at 5:30 p.m. in Hargett's Cessna 210, Registration N732JV.[16] Rhodes filed the plan for Springer during a telephone call Rhodes made to Flight Service Station Specialist, Frank Lamb. The plan, as recorded by Lamb, indicated "AH" in the weather briefing block, Lamb's symbol that the caller "already has" a weather briefing.[17]

9. Sometime in the late afternoon of December 1, 1981, Springer and Hargett loaded Hargett's plane N732JV and attempted to start it. When the plane failed to start, the parties decided to use Cessna 210 N5339Y, the accident aircraft, which was owned by Springer.[18] The luggage from N732JV was transferred to N5339Y. At 5:55 p.m. Springer telephoned Charlotte TRACON to request a departure clearance. He talked with Reginald Hillman, the watch supervisor, who was also serving as associate west arrival/departure controller. The clearance granted by Hillman was as follows: "OK cleared as filed. Maintain 3000 squawk 3146 departure 120.5 … and you cannot depart before twenty-three hundred time now twenty-two fifty-six and one-half, … void if not off by twenty-three fifteen."[19] In that telephone discussion, Springer also informed TRACON of the change in the flight aircraft from N732JV to N5339Y. Thereupon, the TRACON copy of the flight plan was changed to reflect the flight aircraft and scheduled departure time.[20]

10. Under the flight plan and clearance, Springer was required to depart not earlier than 6 p.m., and not later than 6:15 p.m.[21] Under the clearance from Hillman, Springer had the right to elect either a right or left turn upon take-off,[22] and Springer was to "maintain" 3,000 feet.[23] Conflicting testimony was received concerning the import of this clearance. Plaintiff's witnesses Lipscomb and Yeager testified that a pilot would reasonably understand this to require him to be at 3,000 feet above MSL when crossing the Fort Mill VOR.[24] Defendant's witnesses Taylor and Rowan testified that Springer was not required to attain 3,000 feet above MSL by the time he reached the Fort Mill VOR.[25] The court finds the evidence most persuasive that Springer selected a right turn after take-off, intending a flight path after departure that circled to the right for about 270°, before proceeding in an easterly direction toward the Fort Mill VOR. This finding is based upon the following considerations:

(a) A right turn was permissible.[26]

(b) A witness, Mitchell, who was jogging on the runway during the aircraft's take-off, climb and crash, plainly heard the engine sound move to the right (west) of the runway after the aircraft disappeared from view.[27]

---

**16.** *See* Plaintiff's Exhibit 5.

**17.** Lamb Deposition at 16.

**18.** Although a Dr. James Maynard originally maintained an interest in the plane, this interest was assigned to the Springer estate. Thus, the plaintiff is the real party in interest to all claims. *See* Stipulation # 33.

**19.** Plaintiff's Exhibit 39, Tab 3, page 1B.

**20.** *See* Plaintiff's Exhibit 5(a), the "F-dep" strip.

**21.** Aviation times are generally expressed in Greenwich mean time, or "ZULU" time, and are 5 hours ahead of Eastern Standard Time (EST). Hence, 2300Z is 6 p.m., EST.

**22.** Defendant's Response B30 to Plaintiff Hargett's Request for Admissions.

**23.** Concerning altitude/flight level, the term "maintain" means to remain at the altitude/flight level specified. The phrase "climb and" or "descend and" normally precedes "maintain" and the altitude assignment, e.g., "descend and maintain 5,000." Defendant's Exhibit 17, Air Traffic Control Manual, Appendix 4, Pilot/Controller Glossary at 24.

**24.** Lipscomb Testimony at 2–27; Yeager Testimony at 5–75.

**25.** Taylor Testimony at 8–28; Rowan Testimony at 6–105.

**26.** *See* note 22, *supra; see also* Yeager Testimony at 5–76.

**27.** Mitchell Deposition at 18–22. Although Mitchell apparently suffers some slight high pitch hearing problems, the court finds this

(c) The clearance is sufficiently ambiguous to permit an interpretation requiring the pilot to be at an altitude of 3,000 feet by the time the plane reaches the Fort Mill VOR.

(d) The distance to the Fort Mill VOR was sufficiently close to recommend a climbing turn to the right to attain a desired altitude of 3,000 feet before approaching the Fort Mill VOR,

(e) The testimony of expert pilot Lipscomb that, given the known flight conditions and the clearance, a climbing 270° turn to the right would be a more logical initial flight path.[28]

(f) The aircraft, position and heading at the crash site strongly indicate that the departure was to the right.

11. In concluding above that Springer elected a right turn after take-off, the court has considered, and rejected as vague and uncertain, the testimony of witness Rhodes that he heard the plane move left, or east to west across the (extension) runway. This testimony is further discredited because Rhodes was in the back of a large metal building having doors open only to the east when he perceived the sounds of the plane. Therefore, the engine sounds would be subject to variable distortions.

12. The court finds that the left turn flight path suggested by defendant's experts Barnhouse and Taylor would have required Springer to maintain an unrealistic average speed before the crash. Under the left turn theory, Springer would have had to maintain an average speed of 125 knots between a level 200 feet above the runway to the accident site. However, the normal climb-out speed of the Cessna is only 80–90 knots, and the normal enroute climb rate is only 100–110 knots.[29]

13. The court finds that because of the destruction of a radar record, i.e., the CDR, that would have traced the plane's actual flight path, no definitive record concerning the actual flight path remains. Watch supervisor Hillman testified that he had no recollection of the plane ever appearing on the radar scope, and therefore he "ordered" the destruction of the tape.[30] Although the court considers the destruction of the tape to have been hasty and inadvisable, and imprudent in light of the fact that the radar record would have provided the best proof of the actual flight path, the court declines to apply an adverse inference against the defendant, as urged by the plaintiff.

## II. FORECAST WEATHER CONDITIONS

14. The National Weather Service ("NWS") issues periodic aviation area forecasts ("FAs"). The most recent area forecast covering the Carolinas had been issued on December 1, 1981 from Silver Spring, Maryland, at 8 a.m.[31] and had forecast low-level wind shear[32] over the coastal plain Carolinas spreading to southeast Virginia by 7 p.m. The 8 a.m. forecast also predicted wide spread ceilings below 1,000 feet and visibility below 3 miles for the southwestern Virginia, western and southeastern North and South Carolina and coastal waters areas. Under the 8 a.m. forecast, no low-level wind shear was forecast for

would not have been significant in detecting the relatively low-pitched drone of an aircraft engine.

**28.** Lipscomb Testimony at 2–27, 28.

**29.** Barnhouse and Taylor posited a complex flight path including a left turn for about 260°, followed by a right turn just before and during the crash. The suggested left turn flight path roughly resembles an ampersand (&), and is depicted in Defendant's Exhibit 56. In addition to the problem of an unrealistic average speed under the left turn theory, the court finds problems with the central thesis of the left turn

theory, i.e., that spatial disorientation caused defendant to lose his bearings and to cut back across the runway (extended) from east to west. The court finds no support for the theory that conditions were ripe for spatial disorientation.

**30.** Hillman Deposition at 85.

**31.** *See* Plaintiff's Exhibits 15, 61.

**32.** Wind shear is defined as a change in wind direction and/or speed in a very short distance in the atmosphere. *See* Plaintiff's Exhibit 57 at 1 (FAA Advisory Circular, Low-Level Wind Shear).

the Piedmont Carolinas, the area in which the Rock Hill airport was situated.[33]

15. At 10:55 a.m. "SIGMET HOTEL 2"[34] was issued by the NWS. SIGMET HOTEL 2 covered a broad geographical area. The wording of SIGMET HOTEL 2 included Charlotte, but excluded Rock Hill. The forecast predicted "frequent moderate to occasionally severe turbulence between 2,000 and 8,000 feet due to strong wind shear, especially over the mountains." SIGMET HOTEL 2 expired at 2:55 p.m., December 1, 1981, and was cancelled with the notation "conditions have improved."

16. Subsequently, on the same day (December 1, 1981), at 3:10 p.m., effective until 9:10 p.m., and including the time of the crash at Rock Hill, "AIRMET VICTOR 1"[35] was current. AIRMET VICTOR 1 read as follows:

> AIRMET VICTOR 1, December 1st, 2010 GMT—December 2, 0210 GMT (3:10 pm —9:10 pm, EST, December 1, 1981) West Virginia, Maryland, D.C., Delaware, Virginia, North Carolina, South Carolina and adjacent waters. From 50 nautical miles northeast of Elkins, West Virginia to 40 nautical miles northwest of Atlantic City, New Jersey, to 50 nautical miles northeast of Hatteras, North Carolina, to Savannah to 40 nautical miles east of Chattanooga, moderate turbulence at or below 6,000 feet. Wind shear expected due to warm front from southern Delmarva through coastal South Carolina. Continue advisory beyond 0210Z (9:10 p.m. EST).[36]

17. The parties dispute the interpretation of AIRMET VICTOR 1 as far as the area in which the wind shear is expected. Several of plaintiff's expert witnesses, including Brackett, Aiken, Lipscomb, Haggard and Yeager, interpreted the AIRMET as forecasting moderate turbulence at or below 6,000 feet in a large geographic area including all of North and South Carolina, but as forecasting wind shear *only* in the southern Delaware, Maryland, and Virginia peninsula ("Delmarva") through coastal South Carolina. Other experts, including Lamb and Adams, testifying for the defendant, interpreted the AIRMET to mean that although the warm front actually lay from southern Delmarva through to coastal Carolina, wind shear could be expected *anywhere* in the large geographically bounded area described as "from 50 nautical miles northeast of Elkins, West Virginia ... to 40 nautical miles east of Chattanooga," which circumscribed area encompasses Rock Hill. After carefully reviewing all of the pertinent testimony, the court accepts the plaintiff's interpretation for the following reasons:

(a) The cogent testimony of NWS meteorologist Brackett that two separate statements are contained in the AIRMET;[37]

(b) The cogent testimony of NWS meteorologist Aiken that the period (.) in the AIRMET bears significance, and suggests wind shear activity only for the coastal Carolina region;[38]

(c) Significantly, witnesses Brackett and Aiken were NWS forecast officers on duty December 1, 1981, at the Ra-

---

**33.** *See* Plaintiff's Exhibit 16, NWS Geographical Area Designator Map. The "coastal South Carolina area", in contrast, lies adjacent to the Piedmont area, and includes those counties in South Carolina lying along the Atlantic ocean.

**34.** *See* Plaintiff's Exhibit 61 at 3, 4. A SIGMET is an amendment to an area forecast, and includes significant meteorological information that is important to the safety of all aircraft. *See* Defendant's Exhibit 17, ATC Manual, Appendix 4, Pilot/Controller Glossary at 36.

**35.** *See* Plaintiff's Exhibit 61 at 4. An AIRMET is an amendment to the area forecast and concerns weather phenomena that are of operation-

al interest to all aircraft, but which are especially hazardous to limited capability craft, i.e., those craft with limited equipment, or pilot qualification. AIRMETs concern weather of less severity than than covered by a SIGMET. *See* Defendant's Exhibit 17, ATC Manual, Appendix 4, Pilot/Controller Glossary at 3.

**36.** The text as given here is the English language translation of the AIRMET, as provided in Stipulation # 9. The coded AIRMET is contained in Plaintiff's Exhibit 61 at 4.

**37.** Brackett Deposition at 72, 94, 103, 140.

**38.** Aiken Deposition at 34, 37.

leigh/Durham airport, and had responsibility for issuing terminal forecasts for the North Carolina airport terminals, including Charlotte;

(d) The fact that wind shear associated with a warm frontal system is along the frontal system, and precedes the location of the front as it moves, factors well known to meteorologists; [39]

(e) The fact that the earlier forecasts, including the 8 a.m. "FA" and SIGMET HOTEL 2 suggested that the weather was moving in an easterly/northeasterly direction,[40] which is consistent with wind shear activity occurring between Delmarva and coastal Carolina;

(f) The testimony of plaintiff's expert pilot Lipscomb that as a pilot he interpreted the AIRMET to warn of wind shear only in the Delmarva through to coastal Carolinas area; [41]

(g) The testimony of meteorologist Haggard that no wind shear was forecast for the Rock Hill area; [42] and

(h) The fact that the AIRMET includes a period (.) between that portion relating to moderate turbulence and that portion relating to wind shear, by which the court concludes the AIRMET grammatically identified two phenomena in two separate identified areas.

18. The court finds that no terminal forecast for the Rock Hill airport was prepared on December 1, 1981. The Raleigh/Durham Weather Forecast Office, an arm of the NWS, had responsibility for the issuance of terminal forecasts (FTs), applicable to larger aviation terminals located in North Carolina, including Charlotte. The Columbia Weather Forecast Office had responsibility for the issuance of terminal forecasts applicable to larger aviation terminals in South Carolina. Terminal forecasts were not, however, issued for Rock

Hill. Charlotte terminal forecasts were issued on December 1, 1981, at 10:00 a.m. and 6:00 p.m.[43] Neither of these forecasts indicated any wind shear expected for the Charlotte terminal area.[44]

19. In addition to the FAs, SIGMETs, AIRMETS, and FTs discussed in paragraphs 14–18 above, the NWS issues winds alofts forecasts (FDs) for certain locations, including Columbia, South Carolina, Raleigh/Durham, North Carolina, Wilmington, North Carolina and Atlanta, Georgia. FDs were not issued for Charlotte or Rock Hill. The FDs were issued twice a day. The most recent forecast had been issued at 11:40 a.m., December 1, 1981, covering the period 1:00 p.m. to midnight. For the following cities those forecasts were as follows: [45]

| CITY | ALTITUDES MSL | | |
| --- | --- | --- | --- |
| | 3,000 (Feet) | 6,000 (Feet) | 9,000 (Feet) |
| | Dir/Kts | Dir/Kts | Dir/Kts |
| Columbia | 200°/29 | 200°/41 | 230°/47 |
| Raleigh/Durham | 190°/28 | 230°/41 | 230°/47 |
| Wilmington | 200°/31 | 220°/42 | 230°/45 |
| Atlanta | 220°/22 | 230°/38 | 230°/48 |

Significantly, for the cities surrounding the Rock Hill/Charlotte area, the FDs did not indicate any unusually high winds aloft conditions.

20. Predicated upon the foregoing forecasts, i.e., the FA, SIGMETs, AIRMETs, FTs and FDs available for the afternoon and evening of December 1, 1981, the court finds that no wind shear was forecast for the Charlotte or Rock Hill area.

21. The court finds that any information contained in the Surface Weather Maps,[46] available at 5 p.m. to operators at FSS Greer, which might have disclosed the then-present location of the warm front in the Piedmont Carolinas was not, in fact, used to amend the then-current AIRMET

39. Brackett Deposition at 140; Aiken Deposition at 56.

40. Brackett Deposition at 95.

41. Lipscomb Testimony at 2–59, 60.

42. Haggard Testimony at 3–40.

43. See Plaintiff's Exhibits 12, 13.

44. Aiken Deposition at 23.

45. Plaintiff's Exhibit 62; Haggard Testimony at 3–50.

46. Defendant's Exhibit 22.

VICTOR 1, which expired unaltered, at 9:10 p.m. on December 1, 1981. Thus, this information was not disseminated in any weather briefing given after 5 p.m. The testimony of Washington, D.C. Flight Service Specialist Adams as to the weather briefing he would have given after 5 p.m.[47] is not found credible, particularly in light of the fact that Greer FSS personnel had no authority to depart from the official NWS forecasts, warnings, or advisories.[48] Under FSS operating procedures, FSS personnel were to contact a NWS office if they discovered a forecast was inaccurate. The defendant presented no evidence that any individual from FSS Greer ever attempted to have AIRMET VICTOR 1 altered by a NWS office, or, in fact, ever utilized weather maps in briefings. Thus, the court reiterates the finding in paragraph 20 that no wind shear was forecast for the Rock Hill area on December 1, 1981.

### III. ACTUAL METEOROLOGICAL CONDITIONS AT THE TIME OF THE CRASH

22. The several aviation forecasts discussed above, which include the FAs, SIGMETs, AIRMETs, FTs, and FDs, are based upon various NWS meteorological observation sources. These include surface observations, periodic upper air soundings, information gained through satellites, and of substantial importance in this case, PIREPs or pilot reports.

23. The NWS records hourly surface weather observations at Weather Service Offices (WSOs), including Charlotte.[49] Substantial information of the observed weather conditions at Charlotte on the date of the crash is also available from the transcribed radio communications between the Charlotte TRACON and aircraft in the Charlotte control area ("The Yeager transcript").[50]

24. The court finds that throughout the morning and afternoon of December 1, 1981, the sky was generally overcast in the Charlotte area, with ceilings ranging between 200 and 400 feet and visibility between ½ mile and 1½ miles. As the day progressed, the ceilings and the visibility lowered slightly. At 5:25 p.m., the ceiling in Charlotte was 200 feet overcast, with visibility of one-half mile,[51] as compared with 400 feet overcast at about 1:30 p.m. and visibility of 1½ miles.[52] During the day, the winds on the surface at the Charlotte airport were light and variable, at 4–7 knots from the north, north northwest, or north northeast. At 6:12 p.m., the surface winds at Charlotte were from 340° (north northwest) at 7 knots.[53] The surface temperatures in Charlotte throughout the day ranged from 38°F to 40°F. At both ,5:45 p.m. and 6:47 p.m. the temperature was 39°.[54]

25. Although surface weather observations are not recorded for the Rock Hill airport, the conditions approximated the surface weather observations at the Charlotte airport, which was 17.2 miles away. The temperature at Rock Hill was about 39°, with a cloud ceiling of 200 to 250 feet, and visibility of ½ to ¾ miles at the time Springer departed.[55] Further, the winds on the surface were, like the Charlotte winds, essentially calm.[56]

---

47. Defendant's Exhibit 94.

48. Plaintiff's Exhibit 30(b), FAA Flight Services Manual 7110.10F., ¶ 165 at 24. The court also finds considerable difficulty accepting Adams' testimony that the comprehensive type of forecast contained in Defendant's Exhibit 94, which Adams admitted he spent 1½ days preparing, would be available to any pilot calling Greer FSS for a weather briefing. *See also* Haggard Testimony at 3–129 that FSS personnel may not interpret, or amend, NWS forecasts.

49. *See* Plaintiff's Exhibit 22.

50. *See* Plaintiff's Exhibit 39.

51. *Id.* at 34.

52. *Id.* at 16A.

53. *Id.* at 42.

54. Plaintiff's Exhibit 22.

55. Rhodes Testimony at 1–35, 36; Mitchell Deposition at 8.

56. Rhodes Testimony at 1–35.

26. Twice daily, at 7 a.m. and 7 p.m., the NWS issued reports from weather balloons released from several locations (called "Rawinsond Observing Stations") in the continental United States. Charlotte was not such a location. Balloons were released at Athens, Georgia, Charleston, South Carolina, and Greensboro, North Carolina. From those balloons, pressure, temperature, dew point and wind direction and speed are normally recorded at one-minute intervals during ascent. On occasion, certain of the data, particularly wind direction and velocity, may fail to be recorded for all altitudes. This omission may result from either equipment malfunction or from the fact that the balloon has drifted more rapidly than anticipated during its ascent, resulting in the failure of the electromagnetic tracking equipment to locate the balloon and record the wind data. Expert meteorologist Haggard testified that this is a common cause of the failure to record wind data at the lower altitudes.[57]

█ 27. The 7 p.m. Greensboro upper air soundings report for December 1, 1981 failed to record any wind direction or velocity data until the balloon had reached a height of 2,273 meters, or 7,455 feet above the surface.[58]

28. The Greensboro recordings did, however, reveal significant winds aloft activity above 2,273 meters. At 2,273 meters (7,455 feet) above the surface, the winds at Greensboro were from 225° (southwest) at 55 knots. From that height, the winds gradually increased, from 228° (southwest), reaching 71 knots at a height of 5,744 meters (18,840 feet) above the surface.[59]

29. Aircraft approaching Charlotte airport from the south would have experienced wind conditions similar to that over Rock Hill airport, which is located 17.2 statute miles southwest of Charlotte airport. The Charlotte/Rock Hill Approach Plate,[60] indicates that some aircraft are directed to the Fort Mill VOR, the initial approach fix for Charlotte runway 36L. Other aircraft, approaching from the west or southwest, would fly directly over or close to the Rock Hill airport. Thus Plaintiff's Exhibit 39, "The Yeager Transcript", containing reports of pilots approaching Charlotte airport from the south, accurately reflects the conditions that a pilot leaving Rock Hill would encounter.

30. From Plaintiff's Exhibit 39, the wind conditions prevailing in the Charlotte/Rock Hill areas on December 1, 1981 can be established.[61] Based on these transmissions, which contain a constant dialogue between air traffic controllers and pilots concerning the exceptional wind conditions, the court finds there were extremely strong winds from the southwest above the surface in the Charlotte/Rock Hill area. As the day progressed, the winds became stronger. At about 11:30 a.m., the winds at about 4,000 feet altitude (about 3300 feet height) were about 50 knots.[62] At 2:08 p.m., the winds at 4,000 feet altitude were at 70–77 knots.[63] At 3:28 p.m., at an altitude of 3,000 feet, the winds were 60 knots.[64] At 4:47 p.m., at an altitude of 2,900 feet (2,200 feet height) the winds were from 215° at 68 knots.[65] At 4:59 p.m., the winds at 3,000 feet altitude were reported as an overriding southwest wind at 65–70 knots.[66] At 5:04 p.m., an aircraft

57. Haggard Testimony at 3–46, 47.

58. The court takes judicial notice that there are 3.28 feet to a meter.

59. *See* Plaintiff's Exhibit 23.

60. *See* Plaintiff's Exhibit 47(a).

61. Wind speed at a certain altitude can be calculated as the difference between the craft's indicated airspeed, as known to the pilot, and the ground speed, as observed by the air traffic controller.

62. Plaintiff's Exhibit 39, at 6A.

63. *Id.* at 19A, 20A: Barnhouse Testimony at 7–200 to –203.

64. *Id.* at 28.

65. *Id.* at 31.

66. *Id.* at 29A.

with an indicated airspeed of 175 knots was advised that its ground speed was 250 knots, a differential of 75 knots.[67] At 5:37 p.m., all aircraft approaching Charlotte were advised that they could expect a strong tail wind on final [approach] of approximately 60 knots diminishing as they descended.[68] Those advisories by the Charlotte final approach controller continued through the time of Springer's departure from the Rock Hill airport.

31. Experts Haggard and McCarthy agree that at Springer's departure, the winds at 2,100 feet height, were at about 70 knots.

32. Haggard and McCarthy disagree, however, as to the profile of the wind between the surface and 2,100 feet above the surface i.e., the altitude at which Springer began to crash. Both parties agree that, from the surface to the bottom of the frontal slope, the winds were light and from the northeast. Their essential disagreement relates to the height of the frontal slope above Rock Hill, and the gradient within which the shift of winds from the southwest occurred. Plaintiff's expert Haggard testified from a "Vertical Wind Profile" [69] based on the Yeager transcript that the frontal slope was located about 500 feet above Rock Hill. He further testified that within a vertical distance of about 100 feet above the slope, the velocity of the southwest winds increased by about 40 to 45 knots, and from that point up, the winds increased more gradually to a velocity of about 70 knots at 2,100 feet.

33. Defendant's expert McCarthy testified that the winds in Rock Hill were substantially identical to those which he estimated for Greensboro, a city approximately 115 miles from Rock Hill, based upon the 7 p.m. Greensboro upper air soundings re-

port. McCarthy's "Wind Profile" depicted the winds between the surface and some 7,400 feet above the surface.[70] According to McCarthy's calculations, at Rock Hill the surface winds were from the north northwest at about 7 knots. At 2000 feet altitude (1300 feet height) the winds were from the east northeast (about 70°) at about 12 knots, and at 3000 feet (2300 feet height) they were from the southeast (140°) at about 27 knots.[71]

In light of the TRACON/pilot communications in the Yeager transcript, it is obvious that these calculations cannot be accurate, and that the winds at 3000 feet altitude were, in fact, from the southwest at about 70 knots, rather than from the southeast at about 27 knots.

34. A revised wind profile prepared by McCarthy,[72] which is based somewhat on the Air Traffic Controller/Pilot reports, is also in evidence. According to that profile, the winds at 2000 feet altitude were from the east southeast (100°) at about 32 knots, and at 3000 feet altitude were from the south (180°) at 68 knots. The difference between McCarthy's original profile, and his revised profile, apparently represents a partial acceptance of the accuracy of a pilot report given by Eastern Flight 386, which advised of winds of 68 knots.[73]

35. After studying the testimony of both meteorologists Haggard and McCarthy, as well as the underlying data, the court finds Haggard's testimony that a dangerous low-level wind shear condition existed above Rock Hill to be the more persuasive, based on the following:

(a) McCarthy's testimony is premised entirely on the assumption that the winds in Rock Hill were identical to those in Greensboro, a location over 100 miles north of

---

67. *Id.* at 33, 34. The aircraft, Piedmont 61, was 6 miles from the outer marker 33 seconds later.

68. *Id.* at 36.

69. *See* Plaintiff's Exhibit 24(e).

70. *See* Defendant's Exhibits 42, 45.

71. *See* Defendant's Exhibit 45.

72. *See* Defendant's Exhibit 46.

73. Dr. McCarthy depicted this 68 knot wind as coming from the south at *180°*. The actual Eastern 386 report states that the winds were, in fact, coming from the southwest at *215°*. *See* Plaintiff's Exhibit 39 at 31.

Rock Hill.[74] However, the Yeager transcript clearly establishes that the winds at Rock Hill within 2100 feet above the surface were more than twice those opined by McCarthy. The Yeager transcript indicated winds of about 70 knots at 2100 feet above the surface at about the time of the crash, whereas the winds in Greensboro, from the Rawinsond balloons released at 6 p.m., did not show that velocity until a height of 5,744 meters, or nearly 19,000 feet.[75]

(b) The fact that the wind conditions in Rock Hill differed substantially from those in Greensboro is entirely consistent with the evidence concerning a warm front inversion above Rock Hill. Expert McCarthy admitted that in such a warm front inversion, a major portion of the overall wind differential can be concentrated in a narrow band just above the inversion layer.[76] Moreover, this marked change in velocity can be extremely localized, and may not exist along the entire front. Comparison of the Rock Hill and Greensboro winds indicates that the high winds in Rock Hill may, in fact, have been localized in the Charlotte/Rock Hill area.

(c) At 6:08 p.m., Wheeler Airlines flight 304 reported to Charlotte ground control just after landing that the "incredible" tail wind on final had persisted until it was about a mile from the runway, or about 333 feet above the surface.[77]

(d) McCarthy concluded that the frontal slope was located about 1500 feet above the ground at both Rock Hill and Greensboro. However, a chart of the location of the warm front at 6 p.m.[78] indicates that the warm front lay about 34 miles southeast of the Rock Hill airport.[79] It can be calculated that if the warm front lay 34 miles from Rock Hill, the frontal slope would, however, be located at about 516 feet above the surface.[80] This is consistent with Haggard's testimony that the frontal slope was about 500 feet above the surface at Rock Hill, and undercuts, significantly, McCarthy's analysis.

(e) Temperature differentials of 10°F or more within 50 miles across a front is an indication of a likelihood of wind shear.[81]

74. *Compare* Defendant's Exhibit 45–A (Rock Hill Wind Profile) *and* Defendant's Exhibit 42–A (Greensboro Wind Profile).

75. *See* Plaintiff's Exhibit 23.

76. McCarthy Testimony at 7–33, 119 to –123; *see also* Plaintiff's Exhibit 54, *Low-Level Wind Shear,* at 10:

> Wind shear may be enhanced by synoptic and mesoscale discontinuities or other features which have stable layers under low-level inversions. The stability inhibits mixing and momentum transfer, cutting off the effect of friction from the layer above the inversion. Winds at the top of the inversion then can increase and even become supergeostrophic in response to the stronger winds above.

77. Plaintiff's Exhibit 39 at 1E. From the outer marker, located 6.3 miles from the touchdown point, of the runway, the glide slope is a straight line beginning 2100 feet above the surface and descending at 3° below the horizontal. Thus, at one mile from the runway, the glide slope is 2100/6.3, or 333 feet above the surface.

78. Defendant's Exhibit 34.

79. Although the scale is not indicated on Defendant's Exhibit 34, from a comparison of that exhibit and the Charlotte Sectional Aeronautical Chart (Plaintiff's Exhibit 4), the distance from Rock Hill to the warm front, as opined by McCarthy, can be closely approximated. Rock Hill Airport is 59 nautical miles from Columbia, from which a scale of 1" to about 68 nautical miles is established for Defendant's Exhibit 34. On the exhibit, the distance from Rock Hill Airport to the front is ½", or about 34 nautical miles.

80. $\frac{1}{400} \times 34 \times 6076$ feet per mile = 516.46 feet.

Expert witness McCarthy testified that a probable frontal slope for such a warm front was 1/400. McCarthy Testimony at 7–92.

81. Haggard Testimony at 3–61 to –65; Plaintiff's Exhibit 59, Sowa, *Low Level Wind Shear, Its Effects on Approach and Climbout,* at 12. "The front contains significant low-level wind shear if the front in question (cold or warm) meets one or both, of the following criteria: (1) A temperature difference immediately across the front (at the surface) of 10°F (5°C) or more...." *See also* Plaintiff's Exhibit 54, *Low-Level Wind Shear,* at 22, 30. "[T]he temperature difference immediately across the front is a measure of the intensity of the warm front—the greater difference, the sharper the transition zone." *Id.* at 30.

The 6 p.m. chart depicting the location of the warm front[82] in fact reflected temperature differences consistently above 10°F across the frontal line, e.g., 39° in Rock Hill, but 53° in Columbia.

(f) Low level wind shear, by definition, is wind shear existing at or below a height of 2,000 feet.[83]

(g) NWS Forecast Officers Brackett and Aiken, responsible for the issuance of Charlotte terminal forecasts on December 1, 1981, testified that had they been informed that the winds above Rock Hill were as much as 68 knots at about 2,000 feet above the surface, they would have issued an amendment to the terminal forecast, advising of the likelihood of low-level wind shear. Their testimony was the same based on hypotheses of winds of 60 and 50 knots at that height.[84] Such testimony is strong evidence that meteorologists Brackett and Aiken considered such a wind condition hazardous to aviation.

(h) The change in wind speed at various heights that is depicted in Haggard's Vertical Wind Profile[85] would be classified as "severe" under universally recognized standards. The International Civil Aviation Organization (ICAO) has adopted classifications of vertical wind shear in quantitative terms using the following criteria:[86]

| | |
|---|---|
| Light: | 0–4 knots, within 30 meters (Approximately 100 feet) |
| Moderate: | 4–8 knots within 30 meters |
| Strong: | 8–12 knots within 30 meters |
| Severe: | 12 knots or more within 30 meters |

36. Based upon the meteorological information available, the testimony and demeanor of the meteorological experts and the testimony of the NWS forecast officers, the court finds that a severe and dangerous low-level wind shear condition existed above Rock Hill at the time of Springer's departure on December 1, 1981.

## IV. NEGLIGENCE OF THE DEFENDANT

37. FAA Air Traffic Control facilities, including the Charlotte TRACON, have a responsibility to solicit on an hourly basis pilot reports (PIREPs) when certain conditions exist or are forecast. These conditions include, among others, ceilings at or below 5,000 feet, visibility at or below 5 miles and wind shear.[87] In addition, such facilities have an affirmative duty to relay pilot reports to the appropriate offices whether those reports are solicited or not.[88] It is important that air traffic controllers fulfill this duty since the Flight Service Station facilities (FSS), operated by the FAA, then have the duty to enter the PIREP into the NWS teletypewriter system, insuring that the PIREP is fully utilized in pilot weather briefings.

38. The court finds the repeated information available to air traffic controllers in the Charlotte TRACON on the afternoon of December 1, 1981, as expressed in the Yeager transcript, constituted pilot reports. Further, this information was significant to the safety of aviation and should have been communicated to the proper offices. The court further finds that no such information concerning the high winds was communicated. Specifically, the court finds the information coming into the Charlotte TRACON that the winds at about 2,100 feet above Charlotte were in the range of 70 knots from the southwest was significant to aviation, and therefore should have been communicated by the Charlotte TRACON to a local FSS or NWS office. The

---

**82.** Defendant's Exhibit 34.

**83.** Brackett Deposition at 61, 111, 112.

**84.** Brackett Deposition at 107–111; Aiken Deposition at 25–28.

**85.** Plaintiff's Exhibit 24(e). This graph shows that between 500 and 600 feet the wind speed increased by 45 knots.

**86.** *See* Defendant's Exhibit 30.

**87.** Plaintiff's Exhibit 34(b), Air Traffic Control Manual, at 12.1, ¶ 49a; Plaintiff's Exhibit 34(b), Air Traffic Control Manual, Order of January 1, 1981 *re:* Terminal Area Pilot Weather Reports (PIREPs).

**88.** Plaintiff's Exhibit 34(b), Air Traffic Control Manual, at 12.1, ¶ 49a.

immediate responsibility for the appropriate distribution of that information rested upon the watch supervisor, in this case, Reginald Hillman.[89]

39. The information concerning the high winds at Charlotte should have been disseminated either to any Flight Service Station (FSS), such as Greer or Hickory, or directly to a NWS office, such as the Weather Surface Observation (WSO) at Charlotte airport. Unless that information was received by such a facility, the information would not enter the NWS forecast system, and would not alert the appropriate forecaster that a then-current FA, SIGMET, AIRMET, or FT (terminal forecast) was inaccurate.

40. The court finds that in the absence of taking any steps to place the high winds information into the national weather system, so that it would be available to pilots through weather briefings, the Charlotte TRACON personnel had an affirmative duty to relay directly that information to a pilot departing Rock Hill, such as Springer, who would encounter the unusually high winds. Although Springer received his final clearance directly from TRACON watch supervisor Hillman at 5:56 p.m., no information concerning the winds was communicated to Springer at that time.[90]

41. The court finds that the defendant through its agent and employee, Hillman, acting within the scope and course of his employment, was negligent by failing to communicate the available information to a FSS, or to the NWS, or to Springer.

42. Although the FAA has a duty to have properly trained and qualified air traffic controllers in the Charlotte TRACON, the court finds that the air traffic controllers on duty on December 1, 1981, displayed a serious lack of training and understanding of wind shear.[91] A very thorough knowledge of wind shear is important to performing the duties of an air traffic controller, including the duties of advising pilots, and providing input via PIREPs to the national weather system. The court finds that the Charlotte TRACON personnel's failure to comprehend low-level wind shear phenomena unquestionably accounted for the personnel's failure to impart this weather information to a FSS, NWS office, or to Springer.

43. In determining that the Charlotte TRACON was negligent in failing to communicate the PIREPs to the appropriate parties, the court has carefully examined the Yeager transcript. Although the transcript represents only select conversations between pilots and air traffic controllers on December 1, 1981, it is strong evidence that unusually hazardous conditions prevailed during the day. Moreover, the information volunteered by various pilots concerning the difficulty of approaching Charlotte fit

---

**89.** Plaintiff's Exhibit 33(a), Charlotte ATCT Operating Procedures, at 5 § G(3), (6). *See also* Plaintiff's Exhibit 33(c), Charlotte ATC Order of December 17, 1974 re: PIREP/SIGMET RESPONSIBILITY.

**90.** Plaintiff's Exhibit 39 at 1B, 2B. The official transcript is Plaintiff's Exhibit 10.

**91.** (a) Controller Story had the mistaken impression that wind shear could not exist if the surface winds were less than 10–15 knots from a direction opposite those aloft. Story Deposition at 15, 17. *Compare* McCarthy Testimony at 7–112, 113.

(b) Controller Wheeler thought surface winds of 100 knots, with winds of 500 knots at 1,000 feet height from the opposite direction, would not indicate wind shear or be significant to aviation. Wheeler Deposition at 19, 20. Wheeler also had the mistaken impression that the low level wind shear alert system (LLWAS)

would identify *all* wind shear. *Id.* at 18. The LLWAS, however, detects frontal wind shear only within approximately 100 feet of the surface.

(c) Four of the controllers who testified had no familiarity with FAA publication, *Terminal/En Route/FSS, Weather for Air Traffic Service,* Plaintiff's Exhibit 32.

(d) Facilities Operations Officer Herring disputed that SIGMETs and AIRMETs are amendments to the area forecast, resulting in a duty to solicit PIREPs when the conditions specified in the ATC Manual ¶ 49a, Plaintiff's Exhibit 34(b), are forecast. Herring Deposition at 70–72, 77. He also testified that a pilot report of wind shear would be relayed only to aircraft in the area, apparently not to a FSS or the NWS. *Id.* at 149.

Herring also had the impression that wind shear more than 300 feet above the surface would not be dangerous. *Id.* at 127, 128. *Compare* McCarthy Testimony at 7–114.

precisely within the definition of "PI-REPs," [92] that should have been disseminated by Charlotte TRACON. A compelling example is the 6:06 p.m. report of Wheeler Airlines Flight 304 [93] concerning its difficulty during approach in remaining on the glide slope. This PIREP further cautioned that less experienced pilots might encounter substantial difficulty in completing the maneuver. The court finds that the Wheeler 304 report of the "incredible" winds, and other similar reports received all day that the winds were "tricky" or "squirrely," alerted Charlotte TRACON to the hazardous conditions, and made it incumbent on Charlotte TRACON to disseminate this information to aircraft within its control, including those departing from Rock Hill. This duty was clearly breached by Charlotte TRACON personnel.

44. The court finds that the negligence of the Charlotte TRACON personnel, discussed above in paragraphs 38 to 43, was further compounded by the negligence of the NWS in failing to correct its forecast even after information became available that the existing forecast was inaccurate. At three-hour intervals the NWS issued Surface Weather Maps. The most recent map issued prior to Springer's departure was a 4 p.m. map.[94] This map was distributed to all Weather Service offices and all Flight Service Stations. The warm front that had originally been forecast by AIRMET VICTOR 1 to extend from the Delmarva Peninsula to Coastal South Carolina was, in fact, clearly located on that Weather Surface Map about 100 statute miles to the northwest of its forecasted location. Applying the 1/400 frontal slope to which meteorologist McCarthy testified, had that front been located at its forecasted position, the slope above Rock Hill would have

been at about 1,800 feet. This would have been about 1,320 feet higher than the 516 feet it, in fact, was.[95] The frontal location remained substantially the same at 6 p.m. The court finds that the difference in height between the slope of the forecasted warm front and the actual warm front would have been material information to a pilot departing Rock Hill, who might, as Professor Stengel testified, alter his flight path accordingly. The court finds the NWS to have been negligent, in failing to amend AIRMET VICTOR 1, to correct the error concerning the location of the warm front.[96]

## V. SOLE OR CONTRIBUTORY NEGLIGENCE OF SPRINGER

45. The defendant alleges as an affirmative defense that the plaintiff's claims are barred by Springer's contributory negligence. In the alternative, defendant alleges that Springer's negligence was the sole cause of the accident. Basically, defendant points to the following alleged omissions:

(a) Failure to secure a current weather briefing;

(b) Departure in dangerous weather conditions;

(c) Failure to conduct an adequate preflight check of the aircraft;

(d) Hurrying the departure procedures;

(e) Use of the aircraft's rotating beacon while flying in clouds;

(f) Pilot fatigue;

(g) Permitting Hargett, a non-instrument rated pilot, to fly the aircraft during the initial departure path.

These points will be addressed seriatim.

46. The court finds that Rhodes, Caro-Wings' chief pilot, received a weather brief-

---

**92.** Plaintiff's Exhibit 34(b), Air Traffic Control Manual, Appendix 4, at 29 broadly defines a "PIREP" as "[a] report of meteorological phenomena encountered by aircraft in flight."

**93.** Plaintiff's Exhibit 39 at 1E.

**94.** Plaintiff's Exhibit 24(f). Although the NWS actually issued this map at 4 p.m., it did not become available to FSS personnel until approximately 5 p.m., as discussed in paragraph 21.

**95.** *See* text accompanying note 80 *supra*.

**96.** Even defendant's expert meteorologist McCarthy admitted that AIRMET VICTOR 1 was "a bit off" in forecasting the location of the warm front. McCarthy Testimony at 7–96 to –99. Meteorologist Haggard testified that this inaccuracy must have become apparent with the issuance of the 4 p.m. Surface Weather Map. Haggard Testimony at 3–66.

ing from the Greer Flight Service Station (FSS) either shortly before or during the telephone call in which the flight plan was filed. Further, the court finds that Rhodes accurately relayed this weather briefing to Springer.[97] This briefing occurred about 3½ hours before Springer's departure.

47. The court finds that the briefing received by Rhodes and relayed to Springer did not include a forecast of low-level wind shear in the Rock Hill area expected at or about the time of departure. SIGMET HO-TEL 2 was scheduled to expire at 2:55 p.m., and in fact did expire, a few minutes after the briefing. Neither the area forecast, nor the terminal forecast nor the winds aloft forecast predicted low-level wind shear for the Rock Hill area. Additionally, no PIREPs had been provided by the Charlotte TRACON to either the FSS or the NWS, for dissemination to pilots securing weather briefings.

48. The court finds that a competent pilot should, and in the exercise of due care would, secure a more current weather briefing before departure. Such a briefing, for a pilot at the Rock Hill airport, would most probably be obtained from the Greer FSS.

49. As discussed in paragraph 21 above, the court finds that a weather briefing between 5 p.m. and 6 p.m. would have been substantially the same as that given to Rhodes at 2:49 p.m., with the exception that AIRMET VICTOR 1 would have been given, forecasting the location of the warm front from southern Delmarva through to coastal Carolina, and forecasting moderate turbulence for the Rock Hill area, but not forecasting any wind shear. Thus, any pilot calling Greer FSS moments before Springer departed would not have been advised of any actual or potential wind shear at Rock Hill.

50. The court finds that, had the Charlotte TRACON communicated to the FSS system or to the NWS system the fact that winds in the Charlotte area were as high as 68 knots at approximately 2,000 feet above the surface, either the area forecast, the terminal forecast, and/or AIRMET VICTOR 1 would have been amended to forecast a low-level wind shear in the Charlotte area, or a SIGMET would have been issued.[98]

51. Flight Service Stations customarily record weather briefings in a log maintained for that purpose. The Greer FSS preflight briefing log for December 1, 1981 would present the strongest evidence concerning whether Springer called for an updated weather briefing before departure. This case has been greatly complicated by the fact that the log was "routinely" destroyed. No FAA employee has any independent recollection of the contents of the log, or whether it was ever reviewed, under both aircraft number N732JV (Springer's initial flight plan aircraft) or N5339Y (Springer's accident aircraft), for weather briefings given by Greer FSS.[99]

52. The only record of any inquiry to the Greer FSS consists of a telephone communication between the Charlotte TRACON and the Greer FSS after Springer's crash.[100] At 6:59 p.m., Charlotte TRACON telephoned Greer FSS, advising that Aircraft N5339Y had crashed on take-off from Rock Hill, and inquiring whether a pilot briefing had been given. The inquiry was flawed in two respects. First, only N5339Y was identified, whereas the initial flight plan aircraft had been N732JV. Second, the TRACON caller indicated that the departure time was 7 p.m. rather than 6 p.m., and therefore, inquiry was made only

---

97. Rhodes Testimony at 1–21, –40. Rhodes, Carter and Butler all testified that they received no wind shear forecast for the Charlotte area in their weather briefings. Rhodes Testimony at 1–22; Carter Testimony at 2–118; Butler Deposition at 8.

98. Brackett Deposition at 107–111; Aiken Deposition at 25–28. See also Adams Testimony at 6–175 to –178.

99. Lamb Deposition at 42.

100. Plaintiff's Exhibit 39 at 2e–3c.

as to briefings occurring between 6 p.m. and 7 p.m.[101]

53. Similarly, the aircraft Accident/Incident Preliminary Notice,[102] as prepared by TRACON Watch Supervisor Hillman and sent to Hickory FSS, identifies the accident aircraft only and makes no reference to N732JV.

54. Defendant urges that its "routine" destruction of the Greer FSS preflight briefing log creates an inference of Springer's negligence in failing to secure a more current weather briefing. Defendant argues that under its normal procedures had a relevant entry appeared for the evening of December 1, 1981, the log would not have been destroyed. FSS Staff Specialist Adams admitted that under normal FSS accident procedures the entire daily log should have been retained since many times weather briefings to the same pilot are recorded under differing flight numbers, or routes.[103] Particularly because the defendant in this case was the custodian of the record at issue, and because the defendant bears the burden of demonstrating any contributory negligence by Springer, the court declines to draw any inferences adverse to the plaintiff from the "routine" destruction of the weather briefing log. The court stresses that no evidence was produced that a review of the log under flight number N732JV was ever undertaken.[104] The court also declines to draw any inference favorable to the plaintiff from the destruction of the log.

55. For the reasons set out above, the court finds the defendant has not sustained its burden of proving that Springer failed to secure a more current weather briefing. Ultimately, the issue is only of questionable relevancy since as set out above, even a weather briefing received moments before Springer's departure would not have advised of the current high winds in the Charlotte area, or wind shear, which information was not placed in the NWS system due to the failure of Charlotte TRACON to disseminate the appropriate PIREPs.

56. The defendant's expert Taylor testified that the weather conditions were such that departure from the Rock Hill airport should not have been undertaken.[105] Taylor's testimony is, however, riddled with inconsistencies. Taylor also testified that the weather conditions which he assumed, as opined by meteorologist McCarthy, would have presented no problem to a competent pilot such as Springer.[106] The court finds the defendant has failed to carry the burden of proof that Springer's departure from the Rock Hill airport was inconsistent with good piloting, taking into account Springer's competence, his IFR rating, the available weather information, and the condition of the aircraft.

57. The court finds there is no evidence that Springer failed to conduct an adequate preflight check of the aircraft or that Springer hurried his departure. The defendant's allegation is apparently based upon the short time that elapsed between Springer's clearance, completed at 5:57 p.m., and the departure time, which occurred sometime between 6 and 6:15 p.m. Witness David Brown testified Springer was not in a hurry.[107] There also is no evidence whether Springer performed the preflight of the aircraft before or after issuance of the clearance.[108] Finally, there is no evidence that the crash was in any way a result of any defect or failure of the aircraft, detectable through a normal and adequate preflight inspection.

101. *Id.* However, Charlotte TRACON by that time must have known of the switch in planes. The F–Dep strip, or Charlotte TRACON copy of the flight plan containing the change in aircraft and the clearance and void times, was available at the time that call was made. *See* Plaintiff's Exhibit 5(a).

102. Plaintiff's Exhibit 8.

103. Adams Testimony at 6–164.

104. *See* Lamb Deposition at 45–46, to the effect that no search of the log would have been made for a briefing applicable to N732JV.

105. Taylor Testimony at 8–48.

106. *Id.* at 8–20, –61.

107. Brown Deposition at 45.

108. Adams Testimony at 6–171.

58. Witnesses Barnhouse and Taylor initially testified that the aircraft's rotating beacon was on during the departure and climbout, an improper practice in IFR conditions. Taylor acknowledged, however, in cross-examination that he was mistaken. Both the beacon and the strob lights would have been checked by Springer in normal preflight taxiing. This was consistent with an appropriate preflighting of the aircraft, and furnished no evidence that they were on at departure.

59. Defendant's witness Barnhouse speculated that the flight was at the end of a working day, and that Springer may have been tired and less alert than he should have been. There is no evidence of any pilot fatigue, or other physical condition impairing Springer's ability.

60. Defendant's witness Barnhouse also speculated that Springer might have permitted the passenger, Hargett, to take control of the aircraft following departure. Hargett, though a pilot, was not instrument rated. Barnhouse confirmed that operation by Hargett in the IFR conditions would have violated applicable federal aviation regulations. The court finds that there is no evidence to support such rank speculation.

61. The defendant urges that Springer should have selected a left turn after departure. Defendant has admitted, however, that under the clearance issued Springer either a left or a right turn was permissible, and the court will not indulge an allegation that ignores the plain language and meaning of the defendant's admission.[109]

62. In summary, the court finds that no negligence, either sole or contributory, was established on the part of Springer.

## VI. SPATIAL DISORIENTATION

63. Under certain conditions, pilots may become spatially disoriented while flying under IFR conditions. Witnesses Barnhouse and Taylor testified that the accident probably resulted from spatial disorientation. They testified that at least one of four possible conditions might have caused spatial disorientation:

(a) That the rotating beacon was on, resulting in spatial disorientation;

(b) That Springer delegated to Hargett, a non-instrument rated pilot, the control of the aircraft;

(c) That the attitude indicator supplied misinformation, causing spatial disorientation; and

(d) That the weather caused spatial disorientation.

As to the assumptions regarding the beacon, the weather conditions and operation by Hargett, the court has already rejected these in the preceding section as being totally without evidentiary foundation. The paragraphs that follow address assumption (c) above, that the attitude indicator caused Springer to become spatially disoriented.

64. The assumption that the attitude indicator was supplying misinformation is predicated entirely upon the deposition testimony of William G. Denhard. Denhard, an expert in gyroscopics, testified after examining the gyroscopically controlled attitude indicator that was a part of the flight instrumentation of N5339Y. Denhard testified that his examination revealed that the instrument was defective in certain particulars. Moreover, those defects had either existed at the time the instrument was initially assembled, or had occurred in some disassembly after the accident. Importantly, however, Denhard testified that it was impossible to quantify the extent of any resulting misinformation as 1°, 5°, 10° or some other number of degrees. He further testified that the attitude indicator "could very well have given misinformation to the pilot under the conditions of turmoil that existed when it was hit by ... what is the correct word? Jet stream ... wind shear, which information was given to me that such a wind shear occurred." He further testified that the extent of any misinformation "is not quantifiable without full

---

109. Defendant's Response to Plaintiff Hargett's Request for Admission B30.

knowledge of many conditions which are not even defined." [110]

65. The defendant's witness Barnhouse testified that in his opinion, information supplied by the attitude indicator would have to be in the range of 40° of inaccuracy for the instrument to produce spatial disorientation.[111] In light of expert Denhard's candid admission that the degree of misinformation, if any, could not be quantified, the court finds no credible basis for a finding that any misinformation could have contributed to or caused spatial disorientation. The defendant's witness Taylor was willing to hazard a guess, however. Although he testified that he did not know the exact extent of misinformation provided by the attitude indicator, or indeed the degrees necessary to produce spatial disorientation, he "felt" that the misinformation provided by the instrument was "sufficient" or "enough"[112] to produce spatial disorientation. The court does not find the Taylor testimony persuasive in light of its

vagueness. Thus, the court finds no basis for believing that the attitude indicator was defective to the degree necessary to cause spatial disorientation.

66. Based upon the foregoing the court concludes that not one of the four suggested bases for the spatial disorientation theory, which are outlined in paragraph 63 above, is supported by any credible evidence. The court finds, therefore, that spatial disorientation was not a causative factor in this accident.[113]

## VII. PROXIMATE CAUSE

67. The court finds low-level wind shear to be a hazard to both arriving and departing aircraft. Further, this hazard was known to defendant on December 1, 1981.[114] The court further finds that low-level wind shear could be predicted from several critical weather observations.[115]

68. The court finds that the hazard of low-level wind shear to small general avia-

---

**110.** Denhard Deposition at 95–96. On the strength of the Denhard deposition, this court on April 5, 1985, granted Cessna's motion for summary judgment on the basis that under no circumstances could Cessna be held liable under a products liability theory. The United States consented to this order dismissing Cessna.

**111.** Barnhouse Testimony at 7–195, 196.

**112.** Taylor Testimony at 8–64, 69–70.

**113.** Note, however, that even defendant's witness Taylor admitted that a sudden increase in the bank of an aircraft, such as may result from an encounter with wind shear, could well produce spatial disorientation in a pilot. Taylor Testimony at 8–78.

**114.** See Plaintiff's Exhibit 57, FAA publication ACOO–50A *Advisory Circular* re: *Low Level Wind Shear* (dated 1/23/79):
(1) Data compiled on wind shear indicates that the amount of shear in warm fronts is much greater than that found in cold fronts. (§ 4.b(2)).
(2) Turbulence may or may not exist in wind shear conditions. (§ 4.b(3)).
(3) When the rate of descent on an ILS approach differs from the nominal values for an aircraft, the pilot should beware of a potential wind shear situation. (§ 4.e(4)). *Compare* Wheeler 304's pilot report, Plaintiff's Exhibit 39 at 1E.

*See also* Plaintiff's Exhibit 54, NWS publication PB–300 715, *Low Level Wind Shear, a Critical Review,* (April, 1979):
(1) Warm fronts can contain more hazardous shear conditions than cold fronts. (§ 2.2.3.2 at 30).
(2) The two criteria proposed by Sowa as indicators of significant wind shear may not be sufficient in themselves.... A more useful designation would be in terms of temperature gradient; i.e., 5.6°C/50 km (10°F/90 nautical miles). (§ 2.2.3.1.2 at 28).
3. A quantitative estimate of the shear value is possible from the following considerations:
2) The geostrophic wind measured in the warm sector is a good estimate of the wind speed and direction immediately above the frontal transition zone. (§ 2.2.3.1.2 at 29).

**115.** *See* Plaintiff's Exhibit 54, *Low Level Wind Shear, a Critical Review* (April, 1979), Appendix C at C–3, –4.
The gradient level is assumed to be 2,000 feet above the station. Expect wind shear:
Rule 3. When the sustained surface wind is less than 10kt and the absolute value of the sector difference between the gradient wind and the surface wind is 35 kt or greater.
Rule 6. When there is a frontal surface approaching or passing the base with either:
(a) a vector wind difference across the front with a magnitude of 20kt or more per 50 n.mi.
(b) a temperature difference across the front of 10 degrees F or more, per 50 n.mi ...

tion aircraft, such as a Cessna 210, is not less than its hazard to larger, transport aircraft.[116]

69. After carefully reviewing all the testimony and exhibits in this case, and particularly crediting the testimony of the eminent Professor Stengle, the court finds the accident to have occurred in the following manner:

(a) That during Springer's initial climbing right turn, the aircraft encountered a southwest wind, which began at about 500 feet height, and increased within about 100 vertical feet to about 45 knots;

(b) That the initial encounter with the southwest wind was on the aircraft's front left side, and that as the aircraft continued its climbing turn, the direction of the wind relative to the aircraft progressed to the left beam and then to the rear left, while the intensity of the wind continued to increase with the aircraft's climb; [117]

(c) That as a direct result of the aerodynamic effect of the wind on the aircraft, the aircraft was rolled abruptly to an extreme right bank within a few seconds; [118]

(d) That under Springer's flight path an increase in wind velocity from the southwest of 30 knots or more within a vertical distance of about 100 feet would be likely to cause an upset of the aircraft; [119]

(e) That as a direct result of the upset, the aircraft was unable to sustain flight and crashed; [120]

(f) That the abrupt character of the upset is consistent with a *resulting* phenomenon of spatial disorientation, but that any such spatial disorientation was the *result, not the cause,* of the upset;

(g) That the severity of the upset was such as to make it unlikely that a competent, alert pilot would be able to recover, taking into consideration, the suddenness and extent of the upset, the unexpected nature of the event, the height of the aircraft, the aerodynamic characteristics of the aircraft and optimistic estimates for the time required for intelligent and neuromuscular pilot response.[121]

70. The court finds the physical evidence at the crash site is consistent with the findings set out in paragraphs 69 and 3 above.

71. The court finds that a pilot, adequately informed of the likelihood of a severe low-level frontal wind shear would adopt an initial flight path that would minimize the adverse effect on the aircraft's performance. Specifically, the pilot would adopt a path in which the aircraft's wings are level, not banked, while passing through the shear zone.[122]

72. The court finds that Springer, as a competent pilot, would have adopted a flight path consistent with the preceding paragraph, had he been informed of the winds that the Charlotte air traffic controllers knew existed in the Charlotte/Rock Hill area.

73. Based upon the foregoing, the court finds that the crash and Springer's death proximately resulted from the negligence of the defendant, in failing to make weather conditions known to Springer, which conditions were, or by the exercise of due care should have been known, to the defendant through its agents.

74. The court finds that in all respects, the air traffic controllers in the Charlotte TRACON were the agents and servants of the defendant, acting within the course and

**116.** See Plaintiff's Exhibit 55, *Low Altitude Wind Shear and Its Hazard to Aviation,* at 71 [Thus, there is no justification of an assumption that general aviation aircraft are less susceptible to wind shear than transport aircraft].

**117.** Stengel Testimony at 4–23, 24.

**118.** *Id.* at 4–31 to –33.

**119.** *Id.* at 4–23.

**120.** *Id.* at 4–33 to –36; Lipscomb Testimony at 2–29, –30.

**121.** Stengel Testimony at 4–34, –35; Lipscomb Testimony at 2–31.

**122.** Stengel Testimony at 4–20; Lipscomb Testimony at 2–57, 58.

scope of their employment, in the control of air traffic in the Charlotte area on December 1, 1981. All the acts and omissions of said personnel were the acts and omissions of the defendant. Further, the court finds that all personnel of the NWS, in the issuance of forecasts and in the making of all weather observations on December 1, 1981, were the agents and servants of the defendant, acting within the course and scope of their employment, and that all such acts and omissions on the part of such personnel were the acts and omissions of the defendant.

## VIII. DAMAGES

### (A) *Survival Action*

75. From the testimony of witnesses Stengel and Lipscomb, the court finds that the crash occurred within a few seconds after the upset of the aircraft. There is no evidence that Springer was conscious for any period of time following impact. Indeed, from the severity of the impact, the court finds that his death was immediate. The court therefore finds that Springer did not experience conscious pain and suffering.

76. Based on the evidence, particularly the settlement documents between the aircraft owners and the hull insurance carrier, the court finds that the aircraft had a value of One Hundred Ten Thousand and No/100 Dollars ($110,000.00) on December 1, 1981.[123]

77. Springer's estate incurred funeral expenses of Two Thousand Five Hundred Fifty-one and No/100 Dollars ($2,551.00) and the expense of a burial marker of

Eight Hundred Sixty-one and 16/100 Dollars ($861.16).[124]

78. The court finds that the aggregate survival damages for the airplane, funeral expenses and burial marker are One Hundred Thirteen Thousand Four Hundred Twelve and 16/100 Dollars ($113,412.16).

### (B) *Wrongful Death Action*

79. The plaintiff is the duly appointed executrix of the estate of Jon Ricky Springer, and, as such, is the proper party to maintain this action under the Wrongful Death Act of South Carolina. The statutory beneficiaries are the plaintiff as widow, and the three children, Ksena Marie, born October 1, 1974, Rebecca Jean, born June 22, 1978, and Jon Adams, born December 8, 1979.[125]

80. Springer's age was 33.2 years at the time of his death. He had a remaining life expectancy of 40.46 years [126] and a remaining work-life expectancy of 31.8 years to age 65.

81. Rebecca Springer, the decedent's widow, was 31.8 years old at the time of her husband's death,[127] and had a life expectancy as of that date of 45.78 years.

82. The court finds that the plaintiff, Rebecca Springer, has for a number of years suffered from the debilitating disease of agoraphobia, with accompanying panic attacks.[128] Both Dr. Phillips, plaintiff's treating clinical psychologist, and Dr. Ballenger, a psychiatrist specializing in agoraphobia, testified that in 1975 plaintiff first developed agoraphobia when she underwent the stress of caring for several hospitalized family members at one time, but that the disease remained latent before

---

123. Plaintiff's Exhibit 42. The plane had been purchased from its manufacturer on October 30, 1981, for $105,789.45. The value agreed to by hull insurance carrier after the crash was $110,000.00. The carrier paid $109,000.00. The court is informed that there was a $1,000.00 deductible. The court adopts the value agreed to by the carrier, presumably entered into at arms length, as the fair value at the time of loss. The plane had no salvage value. Stipulation # 33.

124. Stipulations # 34, 39.

125. Stipulations # 34, 39.

126. Stipulation # 38.

127. Stipulation # 39.

128. Agoraphobia is an abnormal fear of crossing or being in the midst of open spaces.

Springer's death.[129] Both witnesses also stated that plaintiff's disease has waxed and waned following Springer's death, reaching a low point in early 1984 when plaintiff was virtually housebound, but that since receiving drug treatment from Dr. Ballenger, plaintiff has made substantial progress.[130] Based on the testimony of Drs. Phillips and Ballenger, the court finds that the plaintiff had a pre-existing agoraphobic condition, which was fairly dormant before the crash on December 1, 1981, but which was triggered, or exacerbated, into an active disease by the loss of Springer.[131] The court finds that because of plaintiff's latent agoraphobic condition she was greatly dependent on Springer during their marriage, and therefore, his death has been a severe loss to her. The court further finds, based on the uncontroverted medical testimony, that plaintiff continues to improve, and that her prognosis is "cautiously optimistic."[132]

83. Dr. Oliver Wood, an economist, testified as to the economic loss sustained by the statutory beneficiaries. From the testimony, including relevant exhibits, the court finds that the aggregate net financial loss, before and after trial, is Eight Hundred Fifty Thousand Dollars ($850,000.00).

84. The aggregate intangible loss for mental shock and suffering, wounded feelings, grief and sorrow, loss of companionship, and the deprivation of the use and comfort of Springer's society, suffered by Springer's widow and children, is Four Hundred Fifty Thousand Dollars ($450,-000.00). This figure includes recognition by the court of the greater loss suffered by plaintiff shortly after Springer's death due to plaintiff's severe agoraphobic condition at that time. The figure also includes recognition by the court of the substantial improvement in plaintiff's condition at the time of trial.

85. The court therefore finds that the aggregate damages, pecuniary and intangible, for the wrongful death claim are One Million Three Hundred Thousand Dollars ($1,300,000.00).

## CONCLUSIONS OF LAW

### Legal Standards

1. Under the Federal Tort Claims Act, 28 U.S.C. § 2674, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances...." Jurisdiction is premised on 28 U.S.C. § 1346(b), which provides that the Government is liable "for injury ... or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred ...." See, e.g., Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). In this case, the alleged negligent acts originated in North Carolina and Maryland. Therefore, both North Carolina and Maryland conflicts of law rules would apply. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Correspondingly, both North Carolina and Maryland law dictate that we apply the substantive law of South Carolina because the accident occurred in South Carolina. State of Maryland for Use of Gliedman v. Capital Airlines, Inc., 267 F.Supp. 298 (D.Md.1967); Conrad v. Miller Motor Express, Inc., 265 N.C. 427, 144 S.E.2d 269 (1965). The choice of law rule for South Carolina would also apply

---

**129.** Ballenger Testimony at 5–13; Phillips Testimony at 4–61. There is testimony that plaintiff's disease may, in fact, have predated 1975. Dr. Morgan testified that plaintiff's condition may have developed as early as 1971. Morgan Testimony at 8–87.

**130.** Ballenger Testimony at 5–19; Phillips Testimony at 4–71.

**131.** See Ballenger Testimony at 5–6 (over 60% of active agoraphobics have suffered some recent loss such as the death of a family member); and 5–20.

**132.** Ballenger Testimony at 5–23.

South Carolina law, since that is the place where the injury occurred. *Mobley v. Bland,* 200 S.C. 448, 21 S.E.2d 22 (1942).[133]

2. It is hornbook law that to establish negligence one must prove (1) a duty owed the victim, (2) a breach of that duty (3) which was the proximate cause of the injuries (4) with resultant damages. *Bullard v. Ehrhardt,* 283 S.C. 557, 324 S.E.2d 61 (1984).

### Duty of Care for Air Traffic Controllers

■■■ 3. One who undertakes to render services for another that he recognizes as necessary for the protection of the other is liable in tort for a failure to exercise due care which results in increased risks of harm. *Raymer v. United States,* 660 F.2d 1136 (6th Cir.1981); *Clemente v. United States,* 567 F.2d 1140 (1st Cir.1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). "The relationship between pilots and air [traffic] controllers is imbued with reliance, a foundation stone of tort liability." *Clemente,* 567 F.2d at 1148. Although the United States' liability for negligence under the Federal Tort Claims Act must be determined in accordance with state law, federal regulations may impose duties and standards upon the conduct of the actors. *Gill v. United States,* 429 F.2d 1072 (5th Cir.1970). The Federal Aviation Administration (FAA) has published regulations outlining the obligations of air traffic controllers, which are included in the Air Traffic Control Manual.

■■ The court in *Gill* noted that, "the government's duty to provide services with due care to airplane pilots may rest either upon the requirements of procedures manuals ... or upon general pilot reliance on the government for a given service (citations omitted). That duty, in appropriate circumstances, requires due care in providing both current weather information (citations omitted), and weather forecasts (cita-

tion omitted)." *Gill,* 429 F.2d at 1075. The regulations promulgated by the FAA have the force of law. *Tilley v. United States,* 375 F.2d 678 (4th Cir.1967).

■■ 4. In *Pierce v. United States,* 679 F.2d 617 (6th Cir.1982), which involved a pre-flight weather briefing, the court recognized the duty of FAA personnel employed at Flight Service Stations to provide accurate and complete weather information to pilots. "Since the FAA has undertaken to advise requesting pilots of weather conditions, thus engendering reliance on facilities such as the Indianapolis FSS, it is under a duty to see that information which it furnishes is accurate and complete (citations omitted)." *Id.* at 621. This duty to relay accurate weather information extends to air traffic controllers, as well. *See Inghan v. Eastern Airlines,* 373 F.2d 227 (2d Cir.1967). In *Martin v. United States,* 586 F.2d 1206, 1210 (8th Cir.1978), the court concluded that the duty of an air traffic controller to impart critical information to a pilot may sometimes exceed the literal obligations imposed by the operations manuals. *See also Hartz v. United States,* 387 F.2d 870, 873 (5th Cir.1968). Thus, the air traffic controller must warn of dangers reasonably apparent to him, even beyond the requirements in the manual, if those dangers are not apparent to the pilot in the exercise of due care. *American Airlines, Inc. v. United States,* 418 F.2d 180, 193 (5th Cir. 1969); *Delta Airlines, Inc. v. United States,* 561 F.2d 381 (1st Cir.), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1977). Finally, although the pilot of an aircraft is primarily responsible for its operation, before a pilot can be held legally responsible for the movement of his aircraft he must know, or be held to have known, those facts material to the safe operation of the aircraft. *See American Airlines,* 418 F.2d at 193.

5. Air Traffic Control Manual 7110.-65B,[134] requires controllers to be familiar

---

**133.** At the pretrial conference held on October 31, 1985, both parties agreed that the substantive law of South Carolina applied.

**134.** Plaintiff's Exhibit 34(b).

with the provisions pertaining to their operational responsibility, and to exercise their best judgment if they encounter situations not covered by the Manual.[135] The Manual requires controllers to become familiar with pertinent weather information when coming on duty and to keep abreast of the current weather information needed to perform their air traffic control duties.[136]

The Manual also requires controllers to solicit pilot reports (PIREPs) when one of the following conditions exists or is forecast in their area of jurisdiction,[137]

1. Ceilings at or below 5,000 feet.

2. Visibility (surface or aloft) at or less than five miles ...

6. Wind shear.

Controllers are to obtain PIREPs directly from the pilot, and then to relay pertinent PIREP information to concerned aircraft in a timely manner.[138] Controllers are also to relay all operationally significant PIREPs to the appropriate intra-facility position, the flight service stations serving the area in which the report was obtained, and other concerned terminal or en route air traffic control facilities, including non-FAA facilities.[139]

6. Air traffic controllers have certain duties when issuing clearances. In addition to relaying to a pilot the information concerning his clearance limit, departure procedure or altitude data, the air traffic controller must report any special information at his disposal.[140]

### Breach of Duty by Air Traffic Controllers

■ 7. The court concludes as a matter of law that it was negligence for no employee at the Charlotte TRACON to relay the pilot reports of the strong low-level southwest winds to the FSS in Greer, South Carolina.[141] It was also negligence for these controllers to fail to relay this information to any other FAA or NWS facility or Springer. The FAA and its air traffic controllers owed the aviation community and, in particular, Springer, the duty to conform their conduct to their own manuals and to provide adequate and complete information about severe weather, including wind shear. The air traffic controllers' breach of this duty to warn of low-level wind shear was a proximate cause of the crash of N5339Y and the death of Springer.

8. The duty of the Charlotte air traffic controllers (FAA) to warn Springer of the unusually high winds, and specifically, the wind shear, when he called for his final clearance for take-off, was even further enhanced by the fact that the air traffic controllers knew, or should have known, that they were the *exclusive* source of this information since they had failed and neglected to transmit the PIREPs to *any* weather service facility or other FAA facility.

### Duty of Care for the National Weather Service (NWS)

■ 9. The legislative history leading to the creation of the NWS demonstrates clearly that the government intended to undertake and meet the responsibility for providing a reliable weather monitoring and protection system for persons it knew would rely upon it. *See Brown v. United States*, 599 F.Supp. 877, 884 (D.Mass.1984). Given that defendant undertook to provide a service that was necessary for the protec-

135. *Id.* at Foreward ¶ 1.

136. *Id.* at 11, ¶ 40.

137. *Id.* at 12–1, ¶ 49(a).

138. *Id.* at 12–1, ¶ 49(c), (d).

139. *Id.* at 12–1, ¶ 49(d).

140. *Id.* at 36, ¶ 190(h).

141. Although under the weather conditions prevailing on December 1, 1981, the Charlotte air traffic controllers had both a duty to solicit and relay PIREPs, the duty to solicit PIREPs was fulfilled when the pilots continually volunteered to the air traffic controllers information concerning the unusually high wind conditions, as reflected in the Yeager transcript, Plaintiff's Exhibit 39. The free volunteering of PIREPs by various pilots did not, however, excuse the air traffic controllers from their duty to relay the PIREPs to the appropriate facilities.

tion of Springer, and that Springer relied on that service, the court finds that defendant owed Springer the duty of reasonable care in operating its weather observation and aviation forecast system. *See Brown*, 599 F.Supp. at 885.

10. The NWS has responsibility for the issuance of aviation area forecasts (FAs), aviation terminal forecasts (FTs) and winds aloft forecasts (FDs) including amendments when appropriate, as provided by the NWS Manual.[142]

11. Area forecasts should be amended by NWS whenever the weather improves or deteriorates. The synopsis of the area forecast should be amended when a significant change in the synoptic patterns develops or is expected to develop.[143]

■ 12. The court concludes that the location of the warm front, through Piedmont rather than Coastal South Carolina, was such a significant change in the synoptic pattern as to require an amendment to the area forecast and, more particularly, AIRMET VICTOR 1, which was itself an amendment to the area forecast as originally issued.[144]

13. Terminal forecasts should be amended whenever the responsible forecaster considers it advisable in the interest of safe and efficient aircraft operations. First consideration should be given to provide an advance warning of developing weather that will affect the safety of en route aircraft in the terminal area.[145] A total review of terminal forecasts is required every four hours, to amend them as needed. However, this does not preclude issuance of amended terminal forecasts at any other time, if warranted by developing/changing conditions.[146]

### Breach of Duty by the National Weather Service (NWS)

■ 14. The court concludes that the location of the warm front through the

Piedmont area rather than the Coastal South Carolina area became apparent to the NWS after the issuance of the 4 p.m. Surface Weather Map. Further, this fact was a development significant to the safety of en route aircraft in the Charlotte area and, therefore, the Charlotte terminal forecast should have been amended. Where the criteria for issuing a weather warning for existing phenomena are clearly met, and the information to issue the warning is available, the failure to issue a warning is negligence, and is distinguishable from an erroneous prediction of longer term phenomena. *Brown,* 599 F.Supp. 877.

■ 15. Further, the court concludes that the failure to issue an amendment to the area forecast, or to issue a SIGMET, was a proximate cause of the crash. The court has concluded that the crash was caused by the plane's encounter with low-level wind shear. Had an amendment in the form of a SIGMET been issued, Springer would have had the information to select a flight path that would safely have traversed the shear zone, or to abort the flight.

■ 16. In findings 63 to 66, the court found that spatial disorientation was not a causative factor in the accident. Aside from those findings, the court concludes that even if spatial disorientation prevented Springer from recovering from an otherwise recoverable encounter with wind shear, this would not bar a judgment for plaintiff in view of the defendant's negligence. The situation in this case is distinguishable from the case in *Rawl v. United States,* 778 F.2d 1009 (4th Cir.1985). Rawl's crash resulted from spatial disorientation *caused* by the concurrent negligence of the Air Traffic Control and the pilot, who was non-instrument rated and had knowingly flown into an IFR weather

---

142. Plaintiff's Exhibits 37(a)(b) and (c).

143. Plaintiff's Exhibit 37(a) at 22.

144. *See* Plaintiff's Exhibit 61.

145. Plaintiff's Exhibit 37(b) at 22.

146. *Id.* at 23.

condition in violation of FAA regulations. Unlike Rawl, Springer was rated and competent for the flight. Spatial disorientation, if any, *resulted* not from his negligence, but from conditions beyond his control, the abrupt change in the aircraft's attitude on encountering a wind condition, known to the defendant but not to Springer. *See Pierce*, 679 F.2d at 622 (quoting *Hartzler v. Chesapeake & O.R. Co.*, 433 F.2d 104, 108 (7th Cir.1970):

> It is clear that there can be more than one proximate cause of an airplane crash. The "actual" or immediate cause of the crash may not be provable, especially where all of the occupants perish in the accident.... The mere fact that the plaintiffs were unable to show which of two projected causes was the actual cause of the crash did not mean that they had failed in their burden of proof. If they established a breach of duty by the government which was either the sole proximate cause or a concurrent proximate cause, they made out a prima facie case.

### Damages

17. The South Carolina Wrongful Death Act, S.C.Code Ann. § 15–51–10, *et seq.*, (1976) governs the measure of damages under the Federal Tort Claims Act for the wrongful death of a South Carolina decedent due to the negligence of an agent of the United States. *Brooks v. United States*, 273 F.Supp. 619 (D.S.C.1967). The court concludes that the plaintiff and her three children are the statutory beneficiaries for whose benefit this action is brought.

18. In South Carolina, the elements of damages that are recoverable in a wrongful death action include: (1) pecuniary loss; (2) mental shock and suffering; (3) wounded feelings, (4) grief and sorrow; (5) loss of companionship and (6) deprivation of the use and comfort of the decedent's society. *Mishoe v. Atlantic Coast Ry. Co.*, 186 S.C. 402, 419, 197 S.E. 97, 104 (1938). "It is quite impossible to fix with anything approaching mathematical certainty the damages which one may suffer from the wrongful death of a father or husband, or to place a measure upon the grief which accompanies it." *Norwood v. Atlantic Coast Line Railroad*, 203 S.C. 456, 27 S.E.2d 803, 807 (1943). In paragraph 85 above the court found the aggregate wrongful death damages to amount to One Million Three Hundred Thousand Dollars ($1,300,000.00).

19. In paragraph 78 above, the court concluded that plaintiff, as executrix of the estate, could recover under the Survival Act, S.C.Code Ann. § 15–5–90 (1976). The plaintiff can recover damages for funeral expenses of Two Thousand Five Hundred Fifty-one and No/ Dollars ($2,551.00), burial marker expenses of Eight Hundred Sixty-one and 16/100 Dollars ($861.16), and the value of the destroyed airplane, One Hundred Ten Thousand and No/100 Dollars ($110,000.00), for a total survival damages of One Hundred Thirteen Thousand Four Hundred Twelve and 16/100 Dollars ($113,412.16).

20. In claims brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, damages are determined by the law of the state where the tortious act was committed, subject to the limitations that the United States shall not be liable for interest prior to judgment or for punitive damages. 28 U.S.C. § 2674; *Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956).

### Award of Judgment

Based on the foregoing findings of fact and conclusions of law the plaintiff shall have judgment against the United States of America, as follows:

| | | |
|---|---|---|
| (1) | Wrongful Death Claim | $1,300,000.00 |
| (2) | Survival Claim | 113,412.16 |
| (3) | Costs, as permitted by law. | |