819 F.2d 1139
Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Rebecca G. SPRINGER, as Executrix of the Estate of Jon Ricky
Springer, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant,
Cessna Aircraft Company; Caro Wings Flight Service, Inc., Defendants.
 No. 86-1102.
 United States Court of Appeals, Fourth Circuit.
 Argued March 2, 1987.
Decided May 19, 1987.
 
 Before HALL and CHAPMAN, Circuit Judges, and TIMBERS, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, sitting by designation.
 Thomas Barton Almy, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice (Richard K. Willard, Assitant Attorney General; Vinton D. Lide, United States Attorney, on brief), for appellant.
 R. Frank Plaxco (Thomas H. Pope, Jr.; Thomas H. Pope, III; Bradford N. Martin; Pope & Hudgens, P.A.; Leatherwood, Walker, Tood & Mann, on brief), for appellee.
 PER CURIAM:
 
 
 1
 The United States of America appeals a judgment of the district court entered in favor of plaintiff, Rebecca G. Springer, administratrix of the estate of her deceased husband, Jon Springer. Plaintiff brought this action pursuant to the Federal Tort Claims Act ("FTCA") for the wrongful death of her husband, who died as the result of an airplane crash. Following a bench trial, plaintiff was awarded damages in the amount of $1,300,000 on her wrongful death claim and $113,412.16 on her survival claim, as well as costs and post-judgment interest. We affirm.
 
 I.
 
 2
 On December 1, 1981, shortly after 6:00 p.m., Jon Springer, a thirty-three year old pilot, departed the Rock Hill, South Carolina, airport, destined for Myrtle Beach, South Carolina, in a fully fueled six-passenger Cessna 210 aircraft. Another pilot, Paul Hargett, was his only passenger. The plane was airborne about sixty seconds when it crashed, without explanation, approximately one-half mile from the end of the runway, killing both men.
 
 
 3
 Springer was an experienced pilot with over 2,000 flight hours. The airplane was manufactured in late 1980 and there was no evidence of any mechanical malfunction. On the afternoon of December 1, when he planned his flight, Springer had not been advised of any adverse wind conditions. At 5:55 p.m., Springer telephoned the government air traffic controllers at nearby Charlotte Airport[1] to request a departure clearance and was cleared for takeoff between 6:00 and 6:15 p.m. Charlotte gave Springer no notice or warning of adverse wind conditions even though Charlotte air traffic controllers had been receiving reports all afternoon of severe winds from pilots approaching Charlotte. In particular, at 6:06 p.m. the pilot of Wheeler Airlines flight 304 reported an "incredible" wind condition persisting until about a mile from the field and the Charlotte controllers were advising all approaching aircraft to expect a strong tail wind as they descended.
 
 
 4
 At trial, plaintiff sought to prove that the cause of the crash was a severe wind shear, i.e. a change in wind speed or direction over a given distance, which may produce high winds aloft with only light winds at the surface. The government, on the other hand, contended that the accident was caused by pilot disorientation in the clouds and that the winds and the location of a warm front were unrelated to the accident. Although conceding that a wind shear existed, the government took the position that it commenced only at altitudes higher than those suggested by plaintiff and was not of such severity to cause the pilot to lose control of the Cessna plane.
 
 
 5
 To prove her theory of the accident, plaintiff placed into evidence the expert testimony of weather expert William Haggard. Haggard is a retired meteorologist and former aviation and marine forecaster who was at one time employed by the United States Weather Bureau. Subsequently, he became the Director of the National Climate Center and since his retirement, has served as a consultant in meteorology, testifying in several court cases involving wind shear. Haggard opined that the crash of Springer's plane was caused by a severe low-level wind shear condition existing above the Rock Hill airport at the time of Springer's takeoff. He based his opinion in part on weather forecasts and pilot reports of wind conditions, concluding that there was a warm air front temperature inversion which has the potential for a severe low-level wind shear.
 
 
 6
 To further support her claim, plaintiff called Jack Lipscomb, a former Navy pilot and aerospace engineer, as well as an investigator of numerous aircraft accidents, as her accident reconstruction expert. Lipscomb testified, inter alia, that the location of the wreckage supported the conclusion that the crash had been caused by an encounter "with a shear wind [sic] condition ... which rolled the airplane over and put [Springer] in an unusual attitude from which he could not recover."
 
 
 7
 For its defense, the government relied in part upon the expert testimony of another weather expert, John McCarthy, director of wind shear research for the National Center for Atmospheric Research. McCarthy disputed the severity of the wind shear postulated by Haggard, concluding that the wind profile which Haggard projected was unfounded and would result in "one of the strongest shears ever seen," "so strong that it has never, to my knowledge, been observed."
 
 
 8
 After hearing the evidence presented, the trial court found that although no wind shear had been forecast for Charlotte or Rock Hill on December 1, 1981, and despite calm surface conditions at Rock Hill, there were, unknown to Springer, extremely strong winds from the southwest above the surface in the Charlotte/Rock Hill area. Moreover, according to the court's decision:
 
 
 9
 Based upon the meteorological information available, the testimony and demeanor of the meteorological experts and the testimony of the [National Weather Service] forecast officers, the court finds that a severe and dangerous low-level wind shear condition existed above Rock Hill at the time of Springer's departure on December 1, 1981.
 
 
 10
 Springer v. United States, 641 F.Supp. 913, 925 (D.S.C.1986). In reaching this conclusion, the trial court specifically weighed the testimony of Haggard and McCarthy, in light of the underlying data, and found Haggard's testimony to be the more persuasive. Springer, supra at 923-925.[2]
 
 
 11
 The trial court further found that, based upon all of the evidence, Springer, during his climb, had made a right turn and encountered a severe southwest wind which began at 500 feet; that the intensity of the wind, which was on the plane's left side, had continued to increase with its climb; and that the wind had caused the aircraft to roll abruptly to an extreme right bank, causing the unrecoverable upset and crash of the aircraft. The court further concluded that the government was negligent in failing to communicate available wind shear information to Springer and that its negligence was the proximate cause of the crash and Springer's death. Based upon its factual findings and legal conclusions, the trial court entered judgment for plaintiff and the government's appeal followed.
 
 II.
 
 12
 On appeal, the government contends that the district court erred in admitting and crediting the opinion testimony of Haggard and Lipscomb. Specifically, appellant argues that Haggard was not qualified to testify on the subject of frontal wind shear and that his conclusions about the existence of an extraordinary wind shear on the day of the accident were speculative and not supported by tangible facts. Similarly, the government contends that Lipscomb was unqualified to render an opinion on pilot-related issues and that his opinion regarding the crash was based on assumptions of fact not supported by the record.
 
 
 13
 Upon consideration of the record, briefs, and oral argument, we reject these contentions as meritless. The record unquestionably demonstrates that Haggard possessed sufficient qualifications to testify as a weather expert on the subject of wind shear, as evidenced by his background, training, and experience, including his consulting work for airlines in recent wind shear cases.[3] Thus, the trial court did not err in admitting Haggard's opinion testimony under Fed.R.Evid. 702.[4]
 
 
 14
 Nor are we convinced by appellant's argument that Haggard's testimony about wind shear lacked a factual basis. The government, in particular, challenges Haggard's conclusion that the wind increased from zero at 500 feet to 45 knots at 600 feet, contending that no data specifically represented that projection and that the conclusion was merely, in the witness' words, his "best guess." Haggard testified that this conclusion was based upon his interpretation of all of the data, which included the location of the front, the very slow rate at which it was advancing, general meteorological principles, and the Wheeler Airlines flight 304 report. We conclude that Haggard's opinion testimony is thus adequately supported by the record and that the district judge was entitled to rely on it for his findings.
 
 III.
 
 15
 According to the government, Lipscomb lacked the appropriate experience as a civilian pilot to testify on pilot-related issues and his conclusion that Springer had made a right turn during takeoff was based on an erroneous assumption concerning the clearance requirement for the aircraft. The government also challenges Lipscomb's conclusion that the plane was involved in an unrecoverable upset, asserting that this opinion was based on faulty test flight data. We are unconvinced.
 
 
 16
 Given his twelve years of experience as a naval pilot as well as his education, training, and subsequent employment as an aerospace engineer in aircraft accident investigations, Lipscomb certainly had adequate qualifications to render expert testimony in this case. Moreover, although the evidence about clearance was conflicting, Lipscomb's testimony on the matter was similar to that of at least one other witness and, in any event, the trial judge had additional evidence, upon which he relied, including eyewitness testimony, that Springer had made a right turn during takeoff. The record further demonstrates that Lipscomb's opinion concerning the plane's unrecoverable upset was rendered without objection and was made without relying on the test flight he conducted. Finally, the trial court's decision makes clear that its finding of an unrecoverable upset was not based solely on Lipscomb's testimony.
 
 IV.
 
 17
 For the foregoing reasons, we find no error in the proceedings below. The district court's findings of fact are not clearly erroneous and its judgment is, accordingly, affirmed.
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 Rock Hill airport is a satellite of the Charlotte, North Carolina, airport. It is located 17.2 miles from the Charlotte airport and is within air space controlled by Charlotte's air traffic controllers
 
 
 [2]
 The trial court also noted that, in addition to all of the other evidence, it relied upon the testimony of another one of plaintiff's witnesses, Robert F. Stengel, Ph.D., a professor and recognized expert in aerodynamics, in reaching its conclusion regarding the cause of the accident. Springer, supra at 932
 
 
 [3]
 The government maintains that Haggard's testimony as a paid consultant in trials involving the 1982 Pan Am crash in New Orleans, Louisiana, and the 1985 Delta crash in Dallas/Ft. Worth, Texas, is not indicative of his competence to testify regarding frontal wind shear, the type of wind condition at issue in the present case. According to the government, the record here does not reveal the extent of Haggard's involvement in those two cases, which, in any event, involved a different type of wind shear known as a microburst. We are not persuaded. The government failed to explore below Haggard's role in the other two crash cases and thus hardly has a basis to complain about this matter on appeal. Moreover, the record reveals that frontal shears have historically been well known and well understood
 
 
 [4]
 Fed.R.Evid. 702 provides that:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 The fact that Haggard, unlike the government's expert, McCarthy, has never published on the subject of wind shear, is also not fatal to his being qualified as an expert, as the rule does not make publication a prerequisite.