**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Phillip BERRY, Defendant–Appellant.**

**No. 88–5542.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 7, 1988.
Decided Feb. 1, 1989.

---

Joe B. Brown and Jimmie Lynn Ramsaur Asst. U.S. Attys., William Cohen, Asst. U.S. Atty. (argued), Nashville, Tenn., for U.S.

John S. Colley, III (argued), Columbia, Tenn., for Phillip Berry.

Before WELLFORD and BOGGS, Circuit Judges, and SIMPSON *, District Judge.

WELLFORD, Circuit Judge.

Defendant, Phillip Berry, was convicted of driving under the influence of alcohol while driving on the Natchez Trace Parkway in Tennessee. He claims that blood test results obtained at the direction of a federal park officer while he was unconscious should have been excluded from evidence because applicable state law would exclude this evidence. Alternatively, he ar-gues that the evidence was obtained in violation of the fourth amendment. The magistrate and district court rejected both arguments. We affirm.

Berry was convicted of operating a motor vehicle on federal property under the influence of alcohol in violation of 36 C.F. R. § 4.23 [1] on December 11, 1987. The Magistrate who presided over the trial sentenced Berry to a six month suspended prison sentence, a fine of $100.00, and a Special Assessment of $25.00 under the Crime Control Act of 1984. The district court adopted the findings and proceedings of the magistrate, and Berry appealed.

On May 25, 1987, at approximately 11:30 p.m., Berry, on Natchez Trace Place on the outskirts of, but within, a federal park, drove his brand-new 1987 Chevrolet Blazer off the right side of the road, and the rear of the Blazer struck a culvert alongside the road vaulting the vehicle into the air. No skid marks were found, and the vehicle was demolished; Berry was found severely injured. The road was wet but it was not raining or foggy at the time. It was estimated that Berry was traveling at least the fifty miles per hour speed limit.

Officer Delcamp arrived at the scene shortly after the accident. An ambulance was on the scene, and attendants were preparing Berry to take him to the hospital. At the accident scene, Delcamp watched the attendants work on Berry for a few minutes and while they placed him on stabilization boards. Delcamp examined the truck and the locale, speaking with a witness who was the first to discover the accident. After another officer arrived, Delcamp went to the hospital to see if he could speak with Berry.

When Delcamp arrived at the hospital, he assisted the physicians and nurses who were then treating Berry. Delcamp helped wheel Berry into the treating room, but

---

* The Honorable Charles R. Simpson, III, United States District Court for the Western District of Kentucky, sitting by designation.

1. Both the prosecution and the defendant agree that Berry could not be convicted under 36 C.F.R. § 4.23 (1987) because it was not effective at the time of the accident. The parties agree that the applicable statute was 36 C.F.R. § 4.6 (1986) which reads:

No operator of a vehicle shall be under the influence of intoxicating liquor or drugs.

36 C.F.R. § 4.6 (1986) (superseded by 36 C.F.R. § 4.23, enacted April 2, 1987, effective June 1, 1987, 52 FR 10683 (April 2, 1987)).

was standing at Berry's feet. He also assisted in holding Berry still while the doctors sutured him. Delcamp stated that he was positioned around Berry's midsection, near him, but moving around most of the time.

After the doctors sutured Berry, Delcamp assisted the nurse in taking x-rays. When the hospital staff removed the neck brace, Delcamp held Berry's jaw and neck so the head would not move in the process. Delcamp was then standing directly above Berry's face and noticed the odor of alcohol on Berry's breath. Delcamp estimates that this was about forty-five minutes after the time he arrived at the accident scene. Delcamp was with Berry in the hospital altogether for about three hours.

Other witnesses corroborated Delcamp's observations and suspicions. Treating nurse Kubeck testified that she smelled alcohol on Berry's breath prior to Delcamp's request for a blood test. Dr. Mengubit noted in his medical report that the patient's breath smelled of alcohol. Delcamp asked the nurse to take a blood sample. Berry had been unconscious or semiconscious the entire time and therefore unable to consent to the blood test. Berry's mother signed all consent forms for treatment in the emergency room, but the government does not contend that the mother's waiver authorized the taking of the blood test.

The test was taken using a standard blood alcohol kit that the police had provided to the hospital. Nurse Kubeck administered the test at the officer's request. She explained the test procedures and, after taking the necessary steps, she wrapped the tube containing Berry's blood, placed it in the box with mailing clamps, and gave it to the officer. Both Delcamp and Berry's wife were present during the blood testing.

Delcamp mailed the blood test the next morning to the lab by registered mail. The test reflected a .15 percent blood alcohol level. After Delcamp received the test results, he issued the DUI citation to Berry. Delcamp testified that he did not consider charging Berry until the test results returned positive.[2]

Cynane Robinson, an expert toxicologist, testified that a blood alcohol level in the range of .10–.15 percent would result in "a loss in motor coordination, ... [and] visual acuity, ... [a] decrease in response time, ... a state of euphoria and a decrease of inhibitions." She noted that the degree of the symptoms' severity would vary from person to person. Ron Daniels, Tammy Daniels, Mary Berry, and Shalor Strickland, Berry's mother-in-law, testified that Berry was a good driver and that they did not notice that he was drinking that evening. Berry himself testified that he was an average driver and previously had been in an accident. He said that he had purchased the truck at about 5:30 p.m. that very evening and was not totally familiar with it. He also stated that he had no recollection of the events occurring between a few hours before the accident and a few days after the accident because his "brain was bruised."

Prior to the trial, Berry moved to suppress the results of the blood test claiming that it should be excluded by virtue of Tennessee law under 36 C.F.R. § 4.1[3] or, in the alternative, that it was taken in violation of his fourth amendment rights. The magistrate denied the motion, and found Berry guilty of the charge. Berry renewed his objection by moving unsuc-

---

2. The precise testimony was as follows:
   Q [by Berry's attorney on cross examination]: So, you didn't feel you had adequate grounds to arrest him until you got the blood sample back?
   A [by Officer Delcamp]: We waited for the blood sample, that's correct.
   Joint Appendix at 26.

3. 36 C.F.R. § 4.1 reads in its entirety:
   Unless specifically covered by the general and special regulations set forth in this chap-

ter, the laws and regulations of the State within whose exterior boundaries a park area or portion thereof is located shall govern traffic and the operation and use of vehicles. Such state laws and regulations are hereby adopted and made a part of the regulations in this part.
36 C.F.R. § 4.1 (1986) (superseded by 36 C.F.R. § 4.2, enacted April 2, 1987, effective June 1, 1987, 52 Fed.Reg. 10,683 (April 2, 1987)).

cessfully for an acquittal. The district court held that admission of the blood test results was proper and affirmed the findings and verdict of the magistrate. Execution of the judgment has been stayed pending this appeal.

■ Berry argues that 36 C.F.R. § 4.6, the regulation effective at the time of the accident, is so general that under 36 C.F.R. § 4.1 the court should apply the Tennessee statute which would allow Berry to elect to take a license suspension rather than to permit the government to have the benefit of the blood test results in a prosecution.[4]

In our view 36 C.F.R. § 4.6 does not contemplate or call for the incorporation of state DUI statutes into a federal DUI charge. Section 4.6 was promulgated in 1966, and most DUI statutes then existing were no more specific than § 4.6. *See generally*, Note, *An Analysis of the Drunken Driving Statutes in the United States*, 8 Vand.L.Rev. 888 (1955). The laws in effect in 1966 were promulgated at a time when blood alcohol testing was less sophisticated and when prosecutions were based primarily on observation rather than on medical evidence. The new revisions to the regulations effective June 1, 1987 specifically mention that the regulation intends to incorporate state law not yet enacted. *See* 36 C.F.R. § 4.2(a) (1987). The previous language makes no reference to such laws. *See* 36 C.F.R. § 4.1 (19S6). It does not appear to us that the actual driving under the influence offense in effect in Tennessee in 1987 is any more specific than § 4.6. *Compare, e.g.,* Tenn.Code Ann. § 55–10–401 (1988 Supp.) *and* 36 C.F.R. § 4.6 (1986) (superseded). We conclude that § 4.6 specifically covers this offense and therefore § 4.1 does not require the application of the Tennessee DUI statute in a situation of this kind.

■ Berry complains that the taking of his blood sample by Nurse Kubeck, acting at the direction of a federal officer, violated his fourth amendment right to be free from unreasonable searches and seizures. We conclude that under the circumstances of this case, the taking of a blood sample was not a violation of the fourth amendment. Taking a blood sample may be a search and seizure protected by the fourth amendment, but such a search in this case is not unreasonable. The officer had ample cause to believe that defendant was under the influence of alcohol. The method of testing was safe and reasonable and administered by qualified personnel. It was done only after there was a reasonable basis to effect this "search and seizure."

The fourth amendment states that "[t]he right of the people to be secure in their persons, ... against unreasonable searches and seizures, shall not be violated...." The Supreme Court has held that the taking of a blood test may constitute a "search" for purposes of the fourth amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1965). *Schmerber* involved an arrest and charge of driving under the influence of alcohol and a subsequent blood test.

In *Schmerber* the Court held that a police officer who has validly arrested a suspect need not obtain a warrant in order to instruct medical personnel to draw a blood sample despite the suspect's express refusal to submit to such test. The question in that case was "whether the police were justified in requiring petitioner to submit to a blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness."[5] *Schmer-*

---

4. The relevant Tennessee law regarding driving under the influence allows the police to test an unconscious driver for alcohol, but allows the driver to exclude the results at a subsequent proceeding. If the driver elects to exclude the results of the test, however, his license is automatically suspended for one year. This provision gives the unconscious driver the same rights as a conscious driver. A conscious driver can take a test or refuse testing. If the driver refuses testing, his license is automatically suspended for one year. *See* Tenn.Code Ann. § 55–10–406 (1980 & 1988 Supp.) (amended in 1987, effective date July 1, 1987) (amendment does not alter this section).

5. The Court also stated that the test itself and its performance must be reasonable. By this, the Court meant that the test must involve little risk, pain, or trauma and must be administered by competent qualified medical personnel. *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836.

*ber*, 384 U.S. at 768, 86 S.Ct. at 1834. The Court concluded that the police were justified in taking a blood sample because the defendant was under arrest and because the circumstances indicated that blood test results would be positive. *Id.* at 769–70, 86 S.Ct. at 1835.

*Schmerber* cast its decision in terms of the "search incident to arrest" exception to the warrant requirement. *See id.* at 771, 86 S.Ct. at 1836 (stating "we conclude that the attempt to secure evidence of blood-alcohol content in the case was appropriate incident to the petitioner's arrest"); *see also Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (allowing a limited search incident to a valid arrest). The rationale for a search incident to arrest exception does not directly support the taking of a blood test without the suspect's consent. *See Schmerber*, 384 U.S. at 769–70, 86 S.Ct. at 1835.

We believe, however, that *Schmerber* can be read as an application of the exigent circumstances exception to the warrant requirement. There the facts creating probable cause for arrest also established that the results of the blood test would prove positive. *Id.* at 770, 86 S.Ct. at 1835. The Court concluded that because the accuracy of the test diminishes with time, and because it would take some time for the officer to investigate and find facts establishing probable cause, there would be no time reasonably to expect the officer to obtain a warrant. *Id.* at 770–71, 86 S.Ct. at 1835–36.

Delcamp's failure to arrest Berry before ordering the test is not determinative. In *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Court held that a police's forced taking of samples of the defendant's fingernail scrapings did not violate the fourth amendment. The defendant, Murphy, voluntarily went to the police station to answer questions about his estranged wife's strangulation murder. In the station, the police noticed dark spots on Murphy's nails and suspected that it might

The Court did not address whether a suspect's personal health or religious concerns are significant or whether the police could perform these

be dried blood; they knew that in strangulation cases evidence is often found under the attacker's fingernails. The police took the scrapings from his nails, in spite of his protests. The samples contained traces of the victim's skin and blood. Murphy was not arrested until *one month after* the questioning, but the Court sustained the police action based on the search incident to arrest rule and the exigent circumstances involved.

*Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), indicates that, absent a valid arrest, the minimum constitutional requirements for a warrantless search are probable cause that incriminating evidence will be found and exigent circumstances justifying the search. Because evidence of intoxication begins to dissipate promptly, it is evident in this case that there were exigent circumstances indicating the need to take such action. We find no constitutional violation in police direction of qualified medical personnel at a medical institution or facility without a warrant to administer a blood test when the police have probable cause to suspect that the results of the blood test would be positive. *See also* 2 W. LaFave, Search & Seizures § 5.4(b) (2d ed. 1987). At the same time, we caution that the scope of the search permitted may be more narrow than the search allowed incident to a valid arrest.

Here probable cause clearly existed. Before Delcamp requested a blood sample, he was aware that the suspect was involved in a serious and inexplicable single car accident. For no apparent reason, Berry's vehicle left the road. There were no skid marks to be found. The officer, over a period of time in close proximity to the defendant, smelled the odor of an intoxicant. The nurse and the emergency room doctor treating Berry also smelled alcohol on Berry's breath.

Our holding in this case is consistent with *United States v. Harvey*, 701 F.2d 800, *reh'g en banc denied*, 711 F.2d 144

tests in the police station. *Id.* at 771–72, 86 S.Ct. at 1836. These concerns are not implicated in this case and we do not address them.

(9th Cir.1983). The defendant Chase in that case was unconscious and not under arrest when a blood test was taken. The court held that this blood testing did not violate Chase's fourth amendment rights. *Id.*, 701 F.2d at 805–06. We agree with that holding of the court, but do not necessarily adopt all of its reasoning.

We accordingly AFFIRM the decision of the district court.