MEMORANDUM OPINION
CHARLES R. SIMPSON, III, District Judge.
This matter is before the court on the motion of the United States to compel T.S. to comply with a Federal Grand Jury Subpoena Duces Tecum requesting him to furnish blood samples to the Federal Bureau of Investigation for the purpose of expert examination and comparison with other blood samples.
Relying upon Federal Rule of Criminal Procedure 6(E) and the shield of secrecy under which the Grand Jury operates, the United States has stated that it is precluded from explaining to T.S. the reasons for subpoenaing his blood. However, the United States has explained that it is willing to reveal the reasons in camera to this court. On October 26, 1989, T.S.’s daughter, A.S., disappeared. On October 27, 1992, three years after A.S.’s disappearance, T.S. was served with a Grand Jury Subpoena Duces Tecum to produce his blood samples. On the advice of a California Public Defender, T.S. appeared in person to object to the subpoena. At that time, we appointed counsel for T.S. and the parties agreed to file briefs.
T.S. has now filed a motion to quash the subpoena. He contends that the subpoena violates his Fifth Amendment right against self-incrimination and his Fourth Amendment right against unreasonable search and seizure. The United States has filed a motion to compel T.S.’s compliance with the subpoena. The United States contends that the subpoena does not violate T.S.’s rights under either the Fifth or Fourth Amendments.
I. FIFTH AMENDMENT
In Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court addressed Fifth and Fourth Amendment challenges to compulsory blood extraction. There, Schmerber was taken to a hospital following an automobile accident and placed under arrest for driving while intoxicated after a police officer smelled liquor and noted other signs of intoxication. Id. at 758, 768-69, 86 S.Ct. at 1829, 1884-35. Over Schmerber’s objection, a police officer instructed the hospital to take a blood sample from Schmerber to determine his blood-alcohol level. He was later convicted of driving while under the influence of intoxicating beverages. On appeal, it was argued, inter alia, that the nonconsensual extraction of Schmerber’s blood sample and use of his blood-alcohol test results at trial violated his Fifth Amendment right against self-incrimination and his Fourth Amendment right against unreasonable search and seizure. Id. at 758-59, 86 S.Ct. at 1829.
The Court easily rejected the Fifth Amendment challenge after concluding that the blood-alcohol test was not testimonial in nature.
We hold that the privilege [against self-incrimination] protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, (footnote omitted) and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.
* * * * * *
Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the *1198 extraction or in the chemical analysis. Petitioner’s testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone, (footnote omitted). Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner’s testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds.
Id. at 761, 765, 86 S.Ct. at 1830-31, 1832-33 (emphasis added).
Unlike Schmerber, T.S. does not have the benefit of an explanation for the purpose of his blood samples. However, we are aware of no instance, nor has T.S. advanced one, in which the use of his blood samples would implicate his testimonial capacities. Therefore, we conclude that the subpoena to obtain blood samples from T.S. does not implicate his testimonial capacities and compelled production of those samples does not violate his Fifth Amendment right against self-incrimination.
II. FOURTH AMENDMENT
A.
In Schmerber, the Court expressed more concern over the petitioner’s Fourth Amendment challenge. The Court concluded that the compulsory administration of a blood test “constitutes a search and seizure of a person within the meaning of the Fourth Amendment” and recognized the special sensitivity required with respect to the invasion of a person’s body for a blood sample. Id. at 767, 86 S.Ct. at 1834.
The interests in human dignity and privacy which the Fourth Amendment protects forbids any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officials to suffer the risk that such evidence may disappear unless there is an immediate search.
X * * * * *
The importance of informed, detached and deliberate determinations of the issue whether or not to invade another’s body in search of evidence of guilt is indisputable and great.
Id. at 769-70, 86 S.Ct. at 1835. Noting that search warrants normally are required for searches of dwellings, the Court concluded that “absent an emergency, no less could be required where intrusions into the human body are concerned.” Id.
Although the police officer had not obtained a warrant for Schmerber’s blood sample, the Court held that given the “special facts” of the case, the attempt to secure evidence of the petitioner’s blood-alcohol content was an appropriate incident to petitioner’s arrest despite the absence of a warrant. Id. at 770-71, 86 S.Ct. at 1835-36. The Court cautioned, however, that:
[i]t bears repeating, ..., that we reach this judgment only on the facts of the present record. The integrity of an individual’s person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual’s body under stringently limited circumstances in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.
Id. at 772, 86 S.Ct. at 1836.
The “special facts” in Schmerber all related to the nature of the driving under the influence offense. One special fact which obviated the need for a warrant was the exigency created by the immediate diminishment of blood-alcohol levels. If the officer had delayed to seek out a magistrate to secure a warrant, the evidence sought could have disappeared before the blood test was taken. Id. at 770-71, 86 S.Ct. at 1835-36. Another special fact was that, with driving under the influence charges, the question of blood-alcohol tests often arises in the context of arrests made without warrants. In Schmerber, the Court emphasized that “there was plainly probable cause for the officer to arrest [Schmerber] and charge him with driving an automobile while under the influence of intoxicating liquor.” Id. at 768, 86 S.Ct. at 1834. Thus, despite the absence of a warrant, there had been probable cause initially when Schmerber was arrested.
*1199 After determining that the officer did not need to obtain a warrant for Schmerber’s blood sample under the circumstances, the Court then addressed whether “the test chosen to measure [his] blood-alcohol level was a reasonable one.” Id. at 771, 86 S.Ct. at 1836. The Court concluded that:
[ejxtraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol, (citation omitted). Such tests are a commonplace in these days of periodic physical examinations (footnote omitted) and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.

Id.

B.
Thus, the methodology of Schmerber for deciding whether a particular bodily intrusion was reasonable in Fourth Amendment terms is two-fold. First, as a threshold requirement for a search and seizure entailing intrusion beneath the skin, the ordinary Fourth Amendment requirements of probable cause and a warrant or an exception, like exigent circumstances justifying a warrant-less intrusion, must be satisfied. Second, the particular type of intrusive procedure and the manner in which it is to be performed must be scrutinized for reasonableness. See Hammer v. Gross, 884 F.2d 1200, 1204-05 (9th Cir.1989), vacated on other grounds, 932 F.2d 842 (9th Cir.1992). See also United States v. Berry, 866 F.2d 887 (6th Cir.1989).
In a later case, the Supreme Court again addressed a Fourth Amendment challenge to a search and seizure requiring a bodily intrusion and reaffirmed this two-fold inquiry. In Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Commonwealth of Virginia attempted to obtain a state court order directing Lee, who had been arrested and charged with robbery, to undergo surgery to remove the bullet lodged under his left collarbone. Lee contended that the surgery would violate his Fourth Amendment rights. Id. at 756, 105 S.Ct. at 1614.
In addressing the parameters of the Fourth Amendment protections, the Court first explained that the amendment “generally protects ... against official intrusions up to the point where the community’s need for evidence surmounts a specified standard, ordinarily ‘probable cause.’ ” Id. at 759, 105 S.Ct. at 1615-16. The Court reviewed Schmerber, noting that the authorities clearly had probable cause to believe Schmerber was intoxicated and “to believe that a blood test would provide evidence that was exceptionally probative in confirming this belief.” Id. at 759, 105 S.Ct. at 1616. Schmerber “noted the importance of probable cause” and “recognized that the ordinary requirements of the Fourth Amendment would be the threshold requirements for conducting this kind of surgical search and seizure.” Id. at 760, 105 S.Ct. at 1616 (emphasis added). As in Schmerber, the authorities in Winston clearly had probable cause to believe that Lee was the robber and, therefore, the threshold Fourth Amendment requirement of probable cause had been established.
Beyond the threshold requirement of probable cause, the Court explained that the reasonableness of the particular search and seizure entailing surgical intrusions beneath the skin must be determined “on a ease-by-case approach, in which the individual’s interest in privacy and security are weighed against society’s interests in conducting the procedure.” Id. at 760, 105 S.Ct. at 1616. The Court warned that “[a] compelled surgical intrusion into an individual’s body for evidence, ..., implicates expectations of privacy and security of such magnitude that the intrusion may be such ‘unreasonable’ even if likely to produce evidence of a crime.” Id. at 759, 105 S.Ct. at 1616.
In Winston, the Court concluded that analysis of the reasonableness of a beneath-the-skin intrusion requires balancing the following factors. First, “[t]he extent to which the procedure may threaten the safety or health of the individual” and “the extent of intrusion upon the individual’s dignitary interests in personal privacy and bodily integrity” must be considered. Id. at 761, 105 S.Ct. at 1617. Second, these factors must be weighed against “the community’s interest in fairly and accurately determining guilt or innocence.” Id. at 762, 105 S.Ct. at 1617-18.
*1200 In Schmerber, this balancing led the Court to hold that the blood-alcohol test performed on Schmerber was reasonable for Fourth Amendment purposes because the blood-alcohol tests did not threaten Sehmerber’s health or safety or constitute “an unduly extensive imposition on [Schmerber’s] personal privacy and bodily integrity.” 470 U.S. at 762, 105 S.Ct. at 1617. Moreover, because the blood-alcohol test was a highly effective means of ascertaining the degree of intoxication and there was a clear indication that the desired evidence would be found, the state’s interest in obtaining the blood sample was well established. Id., 470 U.S. at 762-63, 105 S.Ct. at 1618.
Applying this same balancing in Winston, the Court concluded the proposed surgery to remove the bullet was not reasonable for Fourth Amendment purposes. The surgery required a general anesthesia and entailed some risk of nerve and muscle damage and, thus, there was a clear threat to Lee’s health and an extensive intrusion on his personal privacy and bodily integrity. Id. at 762, 105 S.Ct. at 1618. By contrast, the Commonwealth’s need for the evidence was doubtful. Not only was there some question as to the probative value of the bullet, the Commonwealth had other evidence available which would prove the same fact for which the bullet was sought and, thus, had failed to demonstrate a compelling need for the bullet. Id. at 765 n. 10, 766, 105 S.Ct. at 1619 n. 10, 1619-20.
Under the reasoning of Schmerber and Winston, we believe that the compulsory extraction of blood samples is permissible under the Fourth Amendment only in stringently limited circumstances. At a minimum, the warrantless search and seizure of such evidence when there is not a valid arrest should be subject to the same standards as any warrantless search. According to the Supreme Court, “absent a valid arrest, minimum constitutional requirements for a warrantless search are probable cause that incriminating evidence will be found and exigent circumstances justifying the search.” United States v. Berry, 866 F.2d at 891, citing Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) (emphasis added). Probable cause, therefore, is a threshold requirement for search and seizures entailing beneath-the-skin intrusions.[1] Without a warrant or valid arrest, a search and seizure consisting of compulsory blood extraction and testing will be constitutionally permissible under the Fourth Amendment only (1) where there is probable cause to believe that incriminating evidence will be found and (2) exigent circumstances require immediate action. See United States v. Berry, 866 F.2d at 891.
Here, unlike Schmerber, there are no exigent circumstances which, under certain circumstances, would permit the warrantless search and seizure of T.S.’s blood samples. There is no danger that T.S. will be able to destroy the evidence sought or that any delay entailed in obtaining a warrant will impede the grand jury’s investigation. Also, unlike Schmerber, the effort to obtain T.S.’s blood samples is not being made within the context of a valid arrest for which probable cause exists. To our knowledge, T.S. has not been arrested or identified as a target of a grand jury investigation. Neither of the threshold tests for a warrantless search and seizure of T.S.’s blood sample have been met.
C.
Application of Schmerber, however, does not end our inquiry. A significant distinction between the posture of Schmerber and this case complicates our inquiry. The demand for Schmerber’s blood was made after his arrest. By contrast, the demand for T.S.’s blood has been made in the context of a grand jury subpoena. The United States contends that because the request is made with a grand jury subpoena, the usual Fourth Amendment threshold requirements do not apply because their enforcement would inappropriately hamper the grand jury.
It is well established that the grand jury need not have probable cause to issue a *1201 subpoena. Consumer Credit Ins. Agency, Inc. v. United States, 599 F.2d 770, 777 (6th Cir.1979) (Wieck, J., dissenting), cert. denied, 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980). Recently, the Supreme Court explained the differences between the trial and grand jury contexts and the reason why probable cause is not required for grand jury subpoenas.
The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed.... The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred....
A grand jury subpoena is ... much different from a subpoena issued in the context of a prospective criminal trial, where a specific offense has been identified and a particular defendant charged. ‘[T]he identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury’s labors, not at the beginning.’ Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). In short, the Government cannot he required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists. (citation omitted).
United States v. R. Enterprises, Inc., 498 U.S. 292, 297, 111 S.Ct. 722, 726, 112 L.Ed.2d 795 (1991). The Court concluded that the task of the grand jury “is to conduct an ex parte investigation to determine whether or not there is probable cause to prosecute a particular defendant.” Id. at 298, 111 S.Ct. at 726. Despite the grand jury’s broad investigatory powers, the Court cautioned that those powers are not without limitations and that grand juries are “not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass.” Id. at 299, 111 S.Ct. at 727.
In R. Enterprises, the Court had to determine “what standards apply when a party seeks to avoid compliance with a subpoena duces tecum issued in connection with a grand jury investigation.” 498 U.S. at 294, 111 S.Ct. at 724. Three companies moved to quash grand jury subpoenas which sought various corporate records and books and copies of 193 videotapes claiming that the subpoenas called for materials irrelevant to the grand jury’s investigation and that their enforcement would violate their First Amendment rights. The sole inquiry in R. Enterprises was the limit imposed on grand juries by Federal Rule of Criminal Procedure 17(c)’s standard of reasonableness. R. Enterprises involved no Fourth Amendment challenge to the document subpoenas or discussion of Fourth Amendment principles or standards, but concerned only the applicable standard under Federal Rule of Criminal Procedure 17(c).[2]
To the extent that Rule 17(e) imposes some reasonableness limitation on grand jury subpoenas, ..., our task is to define it. In doing so, we recognize that a party to whom a grand jury subpoena is issued faces a difficult situation. As a rule, grand juries do not announce publicly the subjects of their investigations.... A party who desires to challenge a grand jury subpoena thus may have no conception of the Government’s purpose in seeking production of the requested information. Indeed, the party will often not know whether he or she is a primary target of the investigation or merely a peripheral witness. Absent even minimal information, the subpoena recipient is likely to find it exceedingly difficult to persuade a court that “compliance would be unreasonable.” ...
Our task is to fashion an appropriate standard of reasonableness, one that gives due weight to the difficult position of subpoena recipients but does not impair the strong governmental interests in affording *1202 grand juries wide latitude, avoiding mini-trials on peripheral matters, and preserving a necessary level of secrecy.
Id. at 300, 111 S.Ct. at 728. The Court concluded that:
where, as here, a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury’s investigation.
Id. at 301, 111 S.Ct. at 728.[3]
The Court then recognized the difficulty facing persons subpoenaed by the grand jury.
It seems unlikely, ..., that a challenging party who does not know the general subject matter of the grand jury’s investigation, no matter how valid that party’s claim, will be able to make the necessary showing that compliance would be unreasonable .... Consequently, a court may be justified in a ease where unreasonableness is alleged in requiring the Government to reveal the general subject of the grand jury’s investigation before requiring the challenging party to carry its burden of persuasion.
Id. at 301, 111 S.Ct. at 728.
R. Enterprises is distinguishable from this case. R. Enterprises involved a subpoena for documents and objects issued pursuant to Rule 17(c), which authorizes subpoenaing only of books, documents, papers, or other objects. The subpoena here was not issued pursuant to Rule 17(c) and does not seek documentary evidence. A person’s blood sample is not clearly within the scope of Rule 17(c) and obviously raises concerns, including heightened privacy concerns, different from subpoenas seeking documents. In Schmer-ber, the Court noted that because the case concerned “intrusions into the human body rather than with state interferences with property relationships or private papers, [the Court] write[s] on a clean slate.” 384 U.S. at 767-68, 86 S.Ct. at 1834.[4] In other cases, the Court has recognized that searches requiring bodily intrusions must receive heightened scrutiny. In Winston, the Court recognized that the blood test “perhaps implicated Schmerber’s most personal and deep-rooted expectations of privacy” and “Fourth Amendment analysis thus require[d] a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable.” 470 U.S. at 760, 105 S.Ct. at 1616. See also Dionisio, 410 U.S. at 14, 93 S.Ct. at 772.
Despite the broad dicta in R. Enterprises reviewing the powers and purpose of the grand jury, we do not believe that case stands for the proposition that the grand jury is immune from the limitations of the Fourth Amendment in cases where a search entails a beneath-the-skin intrusion. The three companies in R. Enterprises did not raise any Fourth Amendment challenge to the subpoenas and the sole legal issue addressed in R. Enterprises was the appropriate standards under Rule 17(c).[5] That case, therefore, expresses no opinion whatsoever on Fourth Amendment limits for grand jury subpoenas in cases like the one presently before this court. Because the Court repeatedly has recognized the difference inherent in a search requiring bodily intrusion and the special sensitivity with which such searches must be viewed, we believe that R. Enterprises neither constrains us in our Fourth Amendment inquiry nor directs our analysis.
D.
We are aware of only one other federal case which addresses the Fourth Amendment concerns implicated by a grand jury subpoena seeking a blood sample. In Henry v. Ryan, 775 F.Supp. 247 (N.D.Ill.1991), a sheriff subpoenaed blood and saliva samples from Henry after his estranged wife was *1203 murdered. Henry was not a suspect in the murder investigation. After appearing before the grand jury and refusing to provide the samples, Henry filed a motion to quash the subpoena which the trial court denied. After Henry continued to refuse compliance, the court held him in contempt and ordered him jailed until he provided the samples. At the jail, Henry was detained, naked, in an observation cell for eight hours before he decided to provide the samples. Even after providing the samples, Henry was detained, naked, for an unspecified period of time. Id. Henry subsequently filed an action under 42 U.S.C. § 1983 in which he contended, inter alia, that the compelled production of blood and saliva samples constituted an unreasonable seizure under the Fourth Amendment.
The Henry court recognized that, under Schmerber and other Supreme Court precedent, probable cause was a threshold requirement necessary to justify an intrusion into a person’s body. Id. at 254. However, the court concluded that the probable cause requirement was untenable in the context of a grand jury subpoena.
[I]t would appear that probable cause is a necessary element of a grand jury subpoena compelling a bodily intrusion. A probable cause requirement, however, seems untenable in the grant jury situation. The purpose of a grand jury is to determine whether there is probable cause to charge an individual with a crime. Burdening a grand jury with a probable cause requirement seems inconsistent with that purpose.
Id. at 254.
Henry acknowledged, however, that “a grand jury does not enjoy unbridled investigatory powers” and concluded that the evidence collected must still be relevant and particularized. Id.[6] The court held that “a grand jury subpoena for physical evidence must be based on individualized suspicion” rather than on probable cause. Id. The court refused to dismiss Henry’s complaint on the substantive Fourth Amendment ground because individualized suspicion may not have existed.[7] Id. at 255.
We are not inclined to follow Henry. In rejecting the probable cause requirement for grand jury subpoenas, the Henry court primarily relied upon R. Enterprises as rejecting “the idea of requiring a showing of probable cause in connection with a grand jury subpoena.” Id. at 254. As already discussed, both the facts and legal issues in that case are distinguishable because this case and Henry do not involve document subpoenas and both cases address Fourth Amendment challenges.
Furthermore, we are not convinced that a probable cause requirement is untenable in the context of a grand jury subpoena. The probable cause required for a search warrant and for a grand jury indictment are different. A search warrant is evaluated by a flexible standard that requires the issuing magistrate to consider the totality of circumstances and to determine whether there is a fair probability that evidence of a crime will be found in the place searched. Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). By contrast, an indictment requires that the grand jury ascertain whether there is probable cause that a crime has been committed and a particular person committed the crime. See R. Enterprises, 498 U.S. at 297-98, 111 S.Ct. at 726. Unlike the probable cause standard for a warrant, this standard requires more particularity. To conclude that imposition of a probable cause requirement for a grand jury subpoena for a blood sample requires the ultimate conclusion which the grand jury must reach, therefore, ignores the subtle distinctions in these probable cause standards.
Also, merely because a case is before the grand jury does not mean that the use of warrants to obtain evidence to present to *1204 that body is inappropriate. Search warrants are routinely obtained before grand jury proceedings are initiated and even during the course of such proceedings. The government can choose to obtain evidence with a search warrant rather than a subpoena. In these instances, probable cause for the warrant is established presumably without complaints of an undue interference with the grand jury.
In adopting individualized suspicion as the standard, the Henry court cited only one case, Skinner v. Railway Labor Executives Ass’n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), which concerned a Fourth Amendment challenge to federal regulations governing alcohol and drug testing of railway employees. In Skinner, the Court stated that:
[ejxcept in well-defined circumstances, a search or seizure in ... a [criminal] case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause, (citations omitted). We have recognized exceptions to this rule, however, “when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.” (citations omitted). When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context.
Id. at 619, 109 S.Ct. at 1414. The Court also explained that:
[a]n essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objections and scope, (citations omitted). A warrant also provides the detached scrutiny of a neutral magistrate and thus ensures an objective determinations whether an intrusion is justified in any given case.
Id. at 621-22, 109 S.Ct. at 1415.
The Court concluded that a warrant was not necessary to make the alcohol and drug testing regulations constitutional because the regulations were defined narrowly and vested only minimal discretion in those administering the tests. Therefore, there were “virtually no facts for a neutral magistrate to evaluate.” Id. at 622, 109 S.Ct. at 1415-16. The Court also concluded that “the delay necessary to procure a warrant may result in the destruction of valuable evidence.” Id. Thus, as in Schmerber, the Court emphasized the special circumstances underlying the regulation — ie., alcohol and drug levels immediately diminish and a warrant requirement would significantly hinder the objectives of the testing programs. Id. at 623, 109 S.Ct. at 1416.
The Court also rejected the individualized suspicion standard for the alcohol and drug testing regulations. In doing so, the Court explained that:
[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.
Id. at 624, 109 S.Ct. at 1417.
In Skinner, the Court concluded that the search implicated by the regulations would be reasonable despite the absence of individualized suspicion. The railway employees’ expectations of privacy were diminished by their “participation in an industry that is regulated pervasively to ensure safety....” Id. at 627, 109 S.Ct. at 1418. By contrast, the government’s interest in railway safety was compelling and would be jeopardized by imposing an individualized suspicion requirement. Id. at 628, 109 S.Ct. at 1419. After making the initial determination that neither probable cause nor individualized suspicion were required as a threshold, the Court turned to the issue of the reasonableness of the tests and concluded that they were reasonable.
Hex*e, there are no narrowly defined regulations or other guidelines to govern the compulsory extraction of T.S.’s blood samples or to limit the discretion of those seeking to obtain the samples. T.S.’s expectation of privacy is not diminished. We interpret the concern expressed in Skinner over the imme *1205 diate decay of alcohol and drug levels as equivalent to the concern underlying the exception for exigent circumstances in the criminal context. That concern simply is not a factor in this case.
E.
We conclude that the determinative question here is not whether there must be probable cause for the grand jury subpoena for T.S.’s blood samples. Instead, the determinative question is whether a grand jury subpoena, rather than a warrant, can be used to obtain his blood samples.
Two Supreme Court cases address the use of grand jury subpoenas to obtain physical evidence from a person’s body. In United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), and United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), the Court was presented with seizures in the context of grand jury subpoenas for a voice exemplar and a handwriting exemplar. In those cases, the Court concluded that the voice and handwriting exemplars are not protected because the Fourth Amendment does not protect “for what ‘a person knowingly exposes to the public.’ ... Like a man’s facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.” Dionisio, 410 U.S. at 14, 93 S.Ct. at 771. Dionisio and Mara held that the demands made by the grand jury subpoenas in those eases did not constitute a search to which the Fourth Amendment protections applied because there was no reasonable expectation of privacy in voices or handwriting.
Unlike voice and handwriting, a person’s blood is not a characteristic knowingly exposed to the public. Schmerber held that the demand for blood does constitute a search within the protection of the Fourth Amendment. Dionisio did not alter that holding, but specifically distinguished Schmerber because of the extent of intrusion into privacy entailed by the blood sampling. Id. (“The required disclosure of a person’s voice is ... immeasurably further removed from the Fourth Amendment protection than [is] the intrusion into the body effected by the blood extraction in Schmerber.’’). Therefore, Dion-isio implicitly recognized that unlike voice and handwriting exemplars, blood samples are protected by the Fourth Amendment. In Winston, supra, the Court again emphasized the difference in the extent of intrusion in beneath-the-skin procedures and reaffirmed that searches and seizures entailing such procedures were within the Fourth Amendment’s protective ambit.
Although the Supreme Court has never expressly held that a warrant is necessary to obtain an involuntary blood sample which is sought as physical evidence by a grand jury, it also has never held that a warrant is not necessary or that grand jury subpoenas are exempt from Fourth Amendment requirements. Nor has the Court ever characterized blood as an object within the scope of Rule 17(c) or sanctioned the use of a Rule 17(c) subpoena duces tecum for obtaining blood samples. By contrast, the Court has held and repeatedly noted that involuntary blood samples are searches which fall within the Fourth Amendment’s protections. Furthermore, the Court has held that, at least in some circumstances, a warrant and probable cause are required to obtain such samples absent a valid arrest or exigent circumstances.
We hold that the United States’ decision to seek T.S.’s blood sample with a grand jury subpoena was not an appropriate use of such a subpoena. To allow the United States to use a Rule 17(c) subpoena for this purpose would abrogate T.S.’s Fourth Amendment rights and, thus, transform the subpoena into an instrument by which an illegal search and seizure is effectuated. This is a result clearly not intended under the Federal Rules of Criminal Procedure, the Fourth Amendment, or applicable Supreme Court precedent. Consumer Credit, 599 F.2d at 777 (Wieck, J., dissenting).
Therefore, we conclude that the United States must obtain a warrant before we will compel T.S. to comply with the demand for blood samples.[8] To do so, the United States *1206 must establish probable cause that T.S. s blood samples will yield evidence of a crime. If the United States passes this threshold of establishing probable cause, then it must establish that its need for the evidence is greater than the extent to which the blood test poses a risk of harm to T.S. and infringes his dignitary interests in privacy. Only if the balance weighs in favor of the United States should the warrant be issued.
Accordingly, we will GRANT T.S.’s motion to quash the subpoena and Deny the United States’ motion to compel compliance.

. One well-respected commentator lias suggested that Schmerber language requiring a “clear indication” that the evidence sought will be found is "most logically interpreted to necessitate something more than the quantum of evidence ordinarily needed to meet the probable cause test." Wayne R. LaFave, Search and Seizure § 4.1(d) at 130 (2d ed. 1987) (emphasis added).

. Rule 17(c) provides that:
[a] [grand jury] subpoena[1] may ... command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive....

. The Court did not express any opinion on the standard applicable when a subpoena was challenged as too indefinite or overly burdensome.

. In Henry, discussed infra, the court rejected the suggestion that the same standards used to evaluate compelled production of documents should be applied to compelled production of blood and saliva samples. 775 F.Supp. at 254 n. 5.

.Although the companies challenged the subpoenas on First Amendment grounds, neither the Supreme Court nor the court of appeals addressed that issue.

. Henry, in part, relies upon United States v. (Under Seal), 819 F.2d 1139 (4th Cir.1987), cert. denied, 484 U.S. 955, 108 S.Ct. 350, 98 L.Ed.2d 375 (1987), which it characterizes as upholding "the district court's enforcement of a blood sample subpoena not only because the sample was a minimal physical intrusion but because the sample would provide highly relevant and probative evidence.” Id. In that case, however, the subpoenaed party had an opportunity for a show cause hearing at which the government made a sufficient demonstration that the evidence sought was relevant to the grand jury investigation and not sought for any other purpose. Id.

. The court ultimately dismissed Henry's complaint, however, on the basis of qualified immunity. Id. at 256.

. The United States has stated that it would reveal the reasons for seeking T.S.’s blood samples in camera and we see no undue burden by requiring the United States to go one step further *1206 and obtain a warrant, which can be done under seal.